806 F.2d 399
 55 USLW 2329
 SEARS, ROEBUCK AND CO., Allstate Insurance Company, Allstate
Life Insurance Company, Allstate Enterprises,
Inc., Coldwell, Banker & Company, and
Dean Witter Reynolds Inc.,
Plaintiffs-Appellants,
v.
Howard B. BROWN, Acting Commissioner of the Department of
Banking of the State of Connecticut, and The State
of Connecticut, Defendants-Appellees,
and
The Connecticut Bankers Association and The Savings Banks'
Association of Connecticut, Defendants-Intervenors.
 No. 919, Docket 85-9041.
 United States Court of Appeals,
Second Circuit.
 Argued March 12, 1986.
Decided Dec. 3, 1986.
 
 Duane C. Quaini, Chicago, Ill. (Robert C. Johnson, Alan M. Posner, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Illinois, Thomas D. Clifford, Skelley, Clifford, Vinkels, Williams & Rottner, P.C., Hartford, Conn., of counsel), for plaintiffs-appellants.
 John G. Haines, Asst. Atty. Gen., Hartford, Conn. (Joseph I. Lieberman, Atty. Gen. of the State of Connecticut, Jane D. Comerford, Asst. Atty. Gen., Hartford, Conn., of counsel), for defendants-appellees.
 Allan B. Taylor, Hartford, Conn. (J. Bruce Boisture, Day, Berry & Howard, Hartford, Conn., of counsel), for defendants-intervenors.
 (C. Lawrence Evans, Jr., General Counsel and Executive Vice President, Robert-John H. Sands, Corporate Counsel, Washington, D.C., for amicus curiae Acacia Mut. Life Ins. Co.)
 Before KEARSE, CARDAMONE and PIERCE, Circuit Judges.
 PIERCE, Circuit Judge:
 
 
 1
 Appeal by Sears, Roebuck & Co. ("Sears") and five of its financial service subsidiary companies, Allstate Insurance Company ("Allstate"), Allstate Life Insurance Company ("Allstate Life"), Allstate Enterprises, Inc. ("AEI"), Coldwell, Banker & Company ("Coldwell Banker"), and Dean Witter Reynolds Inc. ("Dean Witter"), from a judgment of the United States District Court for the District of Connecticut, Jose A. Cabranes, Judge, 641 F.Supp. 878, upholding the constitutionality of a Connecticut banking statute, Conn.Gen.Stat.Ann. Sec. 36-5a(a)-(d) (West Supp.1986), (the "Act"), which regulates the manner and extent to which bank or savings and loan holding companies may establish offices in the State of Connecticut.[1] Appellants have challenged the constitutionality of the Act as applied to them on Commerce Clause and Supremacy Clause grounds. For the reasons below, we affirm the judgment of the district court.
 
 BACKGROUND
 
 2
 Three subsections of the Act, section 36-5a(b), (c) and (d), are in issue here. Generally, these provisions establish a regulatory scheme that affects all banks and savings and loan associations ("S & L's"), corporations that own one or more banks or S & L's, and the non-banking subsidiaries of such corporations. The Act requires these organizations to obtain permission from the Commissioner of the Connecticut Department of Banking ("Commissioner") prior to opening any office in Connecticut. Subsection (b) establishes a general prohibition precluding these organizations from engaging in "banking business", which is defined under the subsection as including the following activities: "receiving deposits, paying checks, lending money and any activity which is determined by the Commissioner to be so closely related to banking as to be a proper incident thereto", without the permission of the Commissioner.[2]
 
 
 3
 Subsection (c) provides six exceptions to the general prohibition of subsection (b), three of which are relevant here. The first exception allows the subsidiaries of banks, stock S & L's, mutual savings banks or mutual S & L's organized under the laws of Connecticut or having their principal place of business located in the State of Connecticut to open offices without the permission of the Commissioner. Conn.Gen.Stat.Ann. Sec. 36-5a(c)(3) (West Supp.1986). This exception to the applicability of the general prohibition against "banking business" is available as long as the subsidiary's activity is limited to one or more of the functions which its parent organization may carry on directly through the exercise of its express or implied powers under state law.
 
 
 4
 The second such exception is a grandfather provision relieving all "holding companies" and their subsidiaries from the statute's application for all offices that were authorized and in fact engaged in banking business prior to June 1, 1984. Id. Sec. 36-5a(c)(4).[3]
 
 
 5
 The final relevant exception to the application of the general prohibition against "banking business" is stated in subsection (d) and is incorporated by reference into subsection (c). Id. Sec. 36-5a(c)(6). Under this exception firms that are otherwise precluded from opening offices engaged in banking business in Connecticut are allowed to open two such offices per year in Connecticut provided that those offices do not engage in "deposit services". Deposit services are defined by subsection (d) to include "deposits, withdrawals, advances, payments and transfers of funds to or from a deposit account." Under subsection (d), the Commissioner is authorized to charge a fee covering the cost of processing applications by these restricted organizations to engage in "banking business" and has established such fee to be $1,000.
 
 
 6
 The facts of this controversy are undisputed as the case was presented to the district judge upon cross-motions for summary judgment with a joint statement of facts. Sears is a New York corporation with its headquarters in Chicago. Appellant AEI is a wholly owned subsidiary of Sears and itself wholly owns the Sears Savings Bank (formerly known as the Allstate Savings and Loan Association), a California chartered stock thrift institution organized and existing under the laws of California and having all of its offices in California. Therefore, Sears qualifies as a "holding company" under the Act because of its controlling interest in the Sears Savings Bank as a wholly owned second-tier subsidiary.[4]
 
 
 7
 On August 2, 1984, the Commissioner notified Sears of the Act's requirements and requested that Sears provide sufficient information for his determination as to whether two Sears Financial Network centers ("SFN centers") fell within subsections (b) or (d) of the statute. SFN centers generally combine the activities of agents of Allstate and representatives of Dean Witter and Coldwell Banker in order to offer their respective products and services in a central location, typically within a Sears retail outlet. The products offered at SFN centers include the various lines of property, liability, life and health insurance and other products marketed by Allstate and Allstate Life; the dissemination and acceptance of loan applications for AEI; residential real estate brokerage services available through Coldwell Banker; and securities brokerage, principal trading, domestic and foreign investment banking, and related services through Dean Witter. Sears contemplated the establishment of two SFN centers, one in West Hartford and another in Waterford, Connecticut, apparently without knowledge of the application requirement or the prohibitions contained in the Act.
 
 
 8
 After filing this suit for declaratory judgment in the United States District Court for the District of Connecticut to challenge the constitutionality of the Act, but prior to judgment, Sears applied under subsection (b) to the Commissioner on October 11, 1984 to authorize the two SFN centers and a Sears retail store as offices of a "holding company" which are not to be engaged in banking business. Approval as to the retail store was granted by the Commissioner on November 14, 1984, but, on December 28, 1984, the Commissioner determined that the SFN centers would be involved in banking business and that certain activities of the SFN centers would constitute deposit services. More specifically, the Commissioner found that:
 
 
 9
 Within the broad array of financial services provided at a Financial Network are numerous activities which fall within the definition of banking business in section 36-5a(b) of the General Statutes. Such activities include, but are not limited to, the processing of loan applications for Allstate Enterprises, Inc., which loans money for the purchase of automobiles, boats and recreational vehicles and makes second mortgage loans to Connecticut residents, and the making of first mortgage loans on property located in Connecticut through Coldwell Banker Residential Group.
 
 
 10
 JA-41.
 
 
 11
 The Commissioner also found that two of Dean Witter's services constituted "deposit services" that are prohibited by subsection (d) of the Act: (1) the brokering of certificates of deposit for various financial institutions, and (2) the "Sweep Account" feature of the Active Assets Account ("AAA") program offered by Dean Witter. The brokering services that the Commissioner characterized as deposit services involved Dean Witter's brokering of certificates of deposit offered by various financial institutions, including Sears Savings Bank, and the brokering of Sears Money Market Savings Accounts offered by Sears Savings Bank. The AAA program offered by Dean Witter provided a group of integrated financial services that included a margin account capability that would allow an owner of an AAA account to buy and sell securities on a cash basis or on credit. More importantly for purposes of the statute, an owner of an AAA account might also elect to have the funds in his account that were not used for a specific investment purpose automatically invested in one of Sears Savings Bank's "Super NOW" accounts. Dean Witter also acts as agent for an owner who wishes to use the funds deposited in this "Sweep Account." The Commissioner conditioned approval of the SFN centers upon the discontinuation of both these activities. Hence, the Commissioner indicated that he would grant approval pursuant to subsection (d) for the application apropos the two SFN centers conditioned upon two requirements, (1) that Sears not engage in deposit services at the SFN centers and (2) that Sears submit a $1,000 fee for the processing of each application under subsection (d).
 
 
 12
 Subsequently, Sears filed numerous applications seeking the Commissioner's approval of various offices of Sears subsidiary companies. On January 9, 1985, Sears filed applications pursuant to subsection (b) for, inter alia, two offices of Allstate Enterprises Mortgage Corporation ("AEMC") for the purpose of making first mortgage loans on commercial and residential property in Connecticut. The Commissioner rejected these applications by letter dated January 17, 1985, finding that the offices of AEMC would be engaged in banking business and directing that the applications be filed pursuant to subsection (d). No such applications have been filed.
 
 
 13
 As a result of these and other applications by Sears or its subsidiaries between September of 1984 and March of 1985, the Commissioner has unconditionally approved 91 of 95 applications by Sears and its subsidiaries. Through these determinations, the Commissioner has found that general merchandise retail operations, catalog operations, credit-sale operations, and service to retail and catalog customers at Sears retail stores would not enable Sears or any of its subsidiaries to engage in banking business in Connecticut. The Commissioner also determined that residential and commercial real estate brokerage and related services provided primarily by Coldwell Banker did not constitute banking business as long as these activities did not include mortgage banking, mortgage lending, or acceptance of loan applications. In addition, the Commissioner determined that the activities of Sears' various insurance subsidiaries did not enable Sears or any subsidiary of Sears to engage in banking business. Finally, the Commissioner determined that certain new lending activities proposed at existing offices of AEI did not constitute new "banking activity," which would require approval under subsection (b) of the Act, but rather would be authorized under the grandfather provision of subsection (c)(4).
 
 
 14
 As to the four applications that the Commissioner did not unconditionally approve, two for SFN centers and two for AEMC offices, the Commissioner indicated that these activities could be authorized under subsection (d) with the exception of deposit services. The only activities so characterized by the Commissioner, and thereby forbidden altogether, were certain Dean Witter brokering activities and the sweep account aspect of Dean Witter's AAA program.
 
 
 15
 In their suit in the district court, appellants challenged the constitutionality of the Act on both Commerce Clause and Supremacy Clause grounds. The district judge addressed the appellants' contentions first by establishing the appropriate construction of the grandfather clause, contained in subsection (c)(4), and the provisions of subsection (d) of the Act which allow holding companies to open two new offices per year which engage in banking business so long as deposit services are not provided. Notwithstanding appellants' contention to the contrary, the district judge found these provisions to be equally applicable to Connecticut as well as non-Connecticut holding companies based upon the language of the Act and the interpretation given the Act by the Commissioner. Having so construed subsections (c)(4) and (d), the district court therefore focused upon whether the exception in subsection (c)(3) violates the Commerce Clause in that it allows subsidiaries of Connecticut banks and S & L's to open offices engaged in banking business to a greater extent than its out-of-state counterparts.
 
 
 16
 Citing Exxon Corp. v. Maryland, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978), the district court reasoned that discrimination between different entities based upon the non-geographic characteristics of those entities does not implicate the concerns of the Commerce Clause. Further, the district court held that the geographic discrimination against non-Connecticut banks and S & L's vis-a-vis Connecticut banks and S & L's had been authorized by Congress, citing Northeast Bancorp, Inc. v. Board of Governors, 472 U.S. 159, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985). Based upon this analysis and the finding that there was no intent to discriminate against non-Connecticut holding companies and their subsidiaries, the district court rejected appellant's arguments that the Act discriminated against or burdened interstate commerce.
 
 
 17
 The district judge also rejected appellants' claim, under United States Brewers Association v. Healy, 692 F.2d 275 (2d Cir.1982), aff'd mem., 464 U.S. 909, 104 S.Ct. 265, 78 L.Ed.2d 248 (1983), that the Act had an extraterritorial effect. The district court ruled that the Act "seeks to regulate even-handedly the conduct of banking business in Connecticut by certain entities rather than to set the prices of transactions in other states," and that any disincentive to ownership of non-Connecticut banks or savings and loans "does not contravene the Commerce Clause because such a disincentive is based on permissible regulation of a certain form of business unit."
 
 
 18
 Also, the district court ruled that Connecticut's interest in the stable growth of its financial sector in a rapidly changing market environment was substantial and that the even-handed, reasonable and moderate impact of the Act satisfied any concern that there was an excessive burden upon commerce. Thus the Act met the requirements of the balancing test under Pike v. Bruce Church, Inc., 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).
 
 
 19
 As to the Supremacy Clause claims, the district court rejected appellants' argument that the comprehensive nature of the federal Savings and Loan Holding Company Act, 12 U.S.C. Sec. 1730a(a)-(n) (1982) ("SLHCA") implicitly preempted the field of savings and loan holding company regulation holding that: (1) the legislative history reflected a Congressional awareness that certain states' regulation of such companies existed since among other things, the SLHCA contained a provision requiring state and federal regulators of such companies to share information; and (2) nothing in the SLHCA or its legislative history expressed sufficient Congressional intent to preempt all state regulation of such holding companies. Regarding appellants' argument that the Act directly conflicts with one of the purposes of the SLHCA, to protect the marketability of unitary savings and loan holding companies, the district court found that the effect of the Connecticut Act in regulating the number of banking business offices that may be opened in Connecticut presented no obstacle to the purposes of the federal statute since the Act would "have at most a modest impact on [the] marketability" of a thrift institution. In addition, the district court noted that Congress showed no intent that "the various banking business subsidiaries of large, far-flung unitary holding companies would be exempt from any limitations imposed by the states."
 
 
 20
 For these reasons, the district court granted summary judgment in favor of defendants and denied plaintiffs' cross-motion.
 
 DISCUSSION
 1. The Commerce Clause Claims
 
 21
 The Commerce Clause of the Constitution grants Congress the power "[t]o regulate Commerce ... among the several States." Art. I, Sec. 8, cl. 3. Though this language explicitly grants power to Congress, it has long been recognized that this grant of power implicitly limits the authority of the states in the area of interstate commerce. Lewis v. BT Investment Managers, Inc., 447 U.S. 27, 35, 100 S.Ct. 2009, 2014, 64 L.Ed.2d 702 (1980) (citations omitted). In determining whether a state regulation interferes with the explicit power granted to Congress, the Supreme Court has "adopted what amounts to a two-tiered approach to analyzing state economic regulation under the Commerce Clause." Brown-Forman Distillers Corp. v. New York State Liquor Authority, --- U.S. ----, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986). Where the statute directly regulates or discriminates against interstate commerce, or its effect is to favor intrastate economic interests over out-of-state interests, the Court has applied a virtual per se rule of invalidity. Edgar v. MITE Corp., 457 U.S. 624, 640-43, 102 S.Ct. 2629, 2639-41, 73 L.Ed.2d 269 (1982); Philadelphia v. New Jersey, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978); Shafer v. Farmers Grain Co., 268 U.S. 189, 201, 45 S.Ct. 481, 486, 69 L.Ed. 909 (1925). However, where the state regulation is not intentionally protectionist, regulates even-handedly, and has only an incidental impact upon interstate commerce, the Court inquires as to whether there is a legitimate local interest in the regulation and whether the burden on interstate commerce clearly exceeds the local benefits. Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).
 
 
 22
 Appellants argue on appeal that the Act in question was intentionally enacted as protectionist legislation, has a disparate effect upon out-of-state holding companies, and unduly burdens interstate commerce. If appellants successfully establish that the purpose or effect of the Connecticut Act was to protect Connecticut financial institutions from out-of-state competition, then the Act would presumably be rendered per se invalid under Bacchus Imports, Ltd. v. Dias, 468 U.S. 263, 270, 104 S.Ct. 3049, 3055, 82 L.Ed.2d 200 (1984). However, under the two-tiered approach outlined above, should appellants merely establish an incidental burden upon commerce then we must weigh that burden against the legitimate local concern involved. Only if that burden is excessive in relation to the local interest would the Act be found violative of the Commerce Clause. Pike, 397 U.S. at 142, 90 S.Ct. at 847.
 
 
 23
 Appellants base their claim of discriminatory purpose on three sources: statements made by Connecticut Assistant Attorney General Haines during oral argument of the cross-motions below, a report of a state commission appointed by the legislature to study the financial services market and to make recommendations for legislation, and a statement by State Representative Onorato on the floor of the Connecticut House of Representatives. None of these statements is particularly persuasive regarding the intent of the Connecticut legislature in passing the Act, and there was no actual debate of the proposed legislation.
 
 
 24
 The statement made by the assistant attorney general at oral argument during the proceedings below could hardly be considered evidence of legislative intent since it was post hoc and, therefore, not part of the legislative history. Furthermore, the import of his statement was that the purpose supporting the Act was to preclude non-regulated entities "from projecting their basic banking functions which they cannot do directly" into the market for banking services in Connecticut via indirect holding company arrangements.
 
 
 25
 The state or Hebb Commission's report is a part of the legislative history and, therefore, somewhat indicative of the purpose of the legislature. Appellants misconstrue the sentiment expressed in the fourteen page report by reading two phrases out of context.[5] The portions of the report quoted in the footnote were contained in the Commission's findings of fact and recommendations. Rather than implicating an intent to discriminate against interstate commerce as appellants suggest, these statements are reflective of the information gleaned by the Commission and presented to the legislature as to the condition of the market for financial services.
 
 
 26
 In addition to reading the Commission's report in its entirety, the statutory charge to the Commission provides evidence of the context of the report. The Connecticut Legislature stated at section 36-5b(a) that:
 
 
 27
 There is established a commission to inquire into, study and report on the desirability of the state of Connecticut enacting legislation to limit the extent to which a bank holding company, whether organized under the laws of this state or any other state, may maintain an office or conduct any business in this state through a subsidiary of such holding company. Among the principal factors to be considered in determining the appropriateness of such legislation shall be whether it can reasonably be expected to produce benefits to the public such as greater convenience, increased competition or gains in efficiency which outweigh possible adverse effects such as undue concentration of resources, decreased or unfair competition, conflicts of interest or unsound banking practices. In addition, the commission shall consider such other factors as are pertinent to such inquiry including, but not limited to, federal banking legislation, policies with respect to the interstate conduct of banking business and interstate banking's relationship with and impact on intrastate banking. With respect to that relationship, the commission may examine and make recommendations concerning state banking laws and regulations, including home office protection, mergers and consolidations between financial institutions and the type of services which state financial institutions may offer, and activities of nondepository institutions and their impact on traditional banking activities.
 
 
 28
 (Emphasis added).
 
 
 29
 Finally, notwithstanding the recommendation by the Commission of the legislation at issue herein, its primary purpose and primary recommendation was to allow regional interstate banking. See Hebb Commission report, supra note 5, at 13. This recommendation became law at section 36-552 of the Connecticut General Statutes. Since the state had been delegated authority to close its borders to out-of-state banking under the Douglas Amendment to the Bank Holding Company Act, 12 U.S.C. Sec. 1841 et seq., its decision to open them partially was not only within its authority but also was not an action suggesting a protectionist purpose.
 
 
 30
 When viewed in light of the broad context of the full report, the statutory charge to the Commission, and the ultimate legislative recommendations which were made by the Commission, it becomes clear that a protectionist intent cannot be ascribed to the Commission or the legislature. In our view, the allegedly protectionist statements made by the Commission in its fourteen page report merely evidence an attempt to give informed recommendations to the legislature as to how the state could effectively deal with the regulation of banking in Connecticut during a volatile period of nationwide transition in the banking industry.
 
 
 31
 We are unpersuaded that the statements made by State Representative Onorato evidenced a protectionist purpose by the legislature in enacting the Act. Regarding several amendments previously passed by the State Senate addressing interstate banking, Representative Onorato stated to the House of Representatives that:
 
 
 32
 Section 2 [of Senate Amendment "A"] extends the prohibition on the establishment of offices by out-of-state bank holding companies and its [sic] subsidiaries to non-bank subsidiaries, and affiliates of non-Connecticut thrift institutions, and it amends further a clarifying section that the offices of the Connecticut savings banks and savings and loan associations and their subsidiaries are excepted from the prohibitions on the establishment of these offices in Connecticut.
 
 
 33
 ....
 
 
 34
 ... Senate Amendment "A", prohibits the ownership of non-bank banks located in Connecticut by bank holding companies. This rule would apply to all bank holding companies....
 
 
 35
 Connecticut House of Representatives Reports, May 7, 1984, at 409-10.
 
 
 36
 These statements, as an introduction of amending legislation before a legislative body, do not appear to reflect the intent of the legislature as much as they reflect the speaker's understanding of the amendment's effect. The Representative's initial statement in the above quoted text that the prohibition was directed at out-of-state bank holding companies misapprehends the effect of the legislation. However, the Representative's subsequent expression in the final quoted paragraph stating that the "rule would apply to all bank holding companies" reflects the same interpretation adopted by the Commissioner in applying the Act. At best, Representative Onorato's statements are unclear as to whether they express intent or effect.
 
 
 37
 In sum, appellants' assertion that these three statements provide evidence of a protectionist purpose must fail. Of the three statements raised by appellants, one is not part of the legislative history, another has been quoted largely out of context, and the third, while a part of the legislative history, is not helpful in gleaning the intent of the legislature since the language is unclear. Based upon such "evidence" we find the appellants' conclusion that there was an intent to discriminate against interstate commerce to be strained. We next move to the question of whether the Act has the effect of discriminating against interstate commerce.
 
 
 38
 We agree with the district court's construction of the Act and we find no effective discrimination between like entities based upon geographic criteria. Compare BT Investment, 447 U.S. at 40-42, 100 S.Ct. at 2017-18, with Exxon, 437 U.S. at 126-27, 98 S.Ct. at 2214. The Act regulates all holding companies without regard to geography and, thus, does not discriminate on the basis of geography. The Act does, however, distinguish between Connecticut banks and S & L's on the one hand and non-Connecticut banks and S & L's on the other. But, this distinction is not at issue here; further, appellants concede that under the McFadden Act and the Federal Bank Holding Company Act, the states have clearly been granted authority by Congress to exclude all out-of-state banks, see Northeast Bancorp, Inc., 472 U.S. at 170, 105 S.Ct. at 2552. Appellants also concede that federal statutes and regulations grant Connecticut the authority to exclude out-of-state branches of federally chartered S & L's (12 U.S.C. Sec. 1464(r) (1982) and 12 C.F.R. Sec. 556.5(a) (1986)) and acquisitions by multiple S & L holding companies of federally insured thrifts operating in more than one state (12 U.S.C. Sec. 1730a(e)(3) (1982)).
 
 
 39
 As to appellants' contention that the state has no authority to close its borders to an out-of-state, state chartered S & L, such as the Sears Savings Bank, we state no opinion since this issue is not presented by this case. Here, Sears Savings Bank itself is not attempting to enter the state in any way. Rather, subsidiaries of Sears seek to engage in banking business within the State of Connecticut. Appellants' claim that the Connecticut Act violates the Commerce Clause because it regulates the activities of interstate holding companies must fail. As the Court stated in Exxon, "[w]e cannot ... accept appellants' underlying notion that the Commerce Clause protects the particular structure or methods of operation in a ... market," 437 U.S. at 127, 98 S.Ct. at 2214. "[T]he Clause protects the interstate market, not particular interstate firms." Id. In Exxon, the Court found a Maryland statute which precluded companies that refined or produced oil from owning retail gas stations in the state to be constitutional in the face of a Commerce Clause challenge. There, the regulation had been enacted at the height of the gasoline crisis which gripped this country during the late 1970's. Also in that case, there were no refineries or oil production facilities in the State of Maryland nor did any Maryland based company own or operate a refinery or oil production facility in another state. The court held that the statute did not implicate the concerns of the Commerce Clause since it did not make distinctions based upon geographic criteria and since the Commerce Clause was not intended to protect "particular structures" of operation.
 
 
 40
 This case is strikingly similar since the Act herein was passed in response to a perceived crisis in the banking industry, the onslaught of non-bank banks and the increasingly likely prospect of interstate banking. However, any discriminatory effect on out-of-state holding companies is unlikely here since it is clear that Connecticut holding companies do exist and are equally affected by the Act.
 
 
 41
 Finally, applying the Pike balancing test, we find a substantial legitimate local concern in the regulation of banking services within the state. Appellants themselves have implicitly recognized this strong local concern by conceding the states' authority to exclude out-of-state banks from their borders. Moreover, the regulation is tailored and moderate in its effect. It affects only holding companies, allows existing offices of such companies to go unaffected, allows two new non-depository banking offices per year and precludes only deposit services. We conclude that any burden upon interstate commerce cannot be characterized as excessive in relation to the local concern found herein.
 
 2. The Supremacy Clause Claim
 
 42
 Under the Supremacy Clause, a federal law preempts a state law whenever Congress expressly so provides or when preemption must be inferred to ensure fulfillment of the objectives of a federal statute. This inference may be drawn when "[t]he scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947); when " 'compliance with both federal and state regulations is a physical impossibility,' " Fidelity Federal Savings & Loan Association v. de la Cuesta, 458 U.S. 141, 152-53, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982) (quoting Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963)); or "when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' " Fidelity Federal, supra (quoting Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). See also Grocery Manufacturers of America, Inc. v. Gerace, 755 F.2d 993, 999 (2d Cir.), aff'd mem., --- U.S. ----, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985).
 
 
 43
 Appellants argue that the Act prevents the accomplishment of the full purposes and objectives of Congress in enacting the 1967 amendments to the SLHCA. Prior to 1967, the SLHCA did not regulate S & L holding companies or the non-thrift subsidiaries of such holding companies. However, in 1967 Congress added provisions that limited S & L holding companies and their subsidiaries to activities related to the savings and loan business. Savings and Loan Holding Company Amendments of 1967, Pub.L. No. 255, Sec. 2, 82 Stat. 5, 8 (1968) (codified at 12 U.S.C. Sec. 1730a(c)(2) (1982)). In enacting this regulation, Congress left unitary holding companies, those that owned only one thrift institution, unrestricted. Id. Appellants point out that Congress left unitary holding companies unrestricted because it feared that restrictions would "seriously impair the marketability of existing capital stock associations." S.Rep. No. 354, 90th Cong., 1st Sess. 6 (1967). Appellants argue that the Connecticut Act thwarts this Congressional objective by discouraging holding companies from purchasing existing thrift institutions. For example, appellants posit that a corporation whose subsidiaries engage in "deposit services" in Connecticut would be unable to purchase a non-Connecticut thrift unless it were willing to give up the opportunity of opening new Connecticut offices offering "deposit services."
 
 
 44
 We do not doubt that the Connecticut Act will have some impact on the marketability of thrifts. However, we do not find protection of the marketability of thrifts to be one of the objectives of Congress in enacting the amendments to the SLHCA. As mentioned above, Congress did not wish the SLHCA to impair the marketability of existing thrifts. We find this to be evidence that Congress did not want the SLHCA to deter companies from buying thrifts. In other words, Congress wished to avoid doing harm, but showed no intent to protect affirmatively S & L marketability. We cannot conclude that Congress impliedly preempted any state regulation that might reduce the marketability of thrift institutions. Thus, the potential impairment of the marketability of S & L's does not invalidate the challenged provisions of the Connecticut Act on Supremacy Clause grounds.
 
 
 45
 The main purpose behind the SLHCA expressed at the time of its enactment was to protect S & L's from becoming "entangled in a corporate web designed to promote" interests unrelated to the purposes for which S & L's were created--encouraging thrift and promoting home ownership. S.Rep. No. 810, 86th Cong., 1st Sess., reprinted in 1959 U.S.Code Cong. & Ad.News 2883, 2887. Another important goal was to preserve the thrifts' emphasis on local ownership, local management and local investment. Id. The 1967 amendments were intended primarily to further promote the "goals of encouraging thrift and providing a main source of residential financing." H.R.Rep. No. 997, 90th Cong., 2d Sess., reprinted in 1968 U.S.Code Cong. & Ad.News 1601, 1603. Appellants posit, and we perceive, no conflict between these objectives and the challenged provisions of the Connecticut Act.
 
 
 46
 Appellants urge that if Congress had wanted to allow the states to regulate the activities of holding companies and their subsidiaries it could have included in the SLHCA a provision analogous to section 7 of the Bank Holding Company Act, 12 U.S.C. Sec. 1846 (1982), which expressly empowers states to regulate bank holding companies and their subsidiaries. It is argued that since the SLHCA does not expressly allow regulation of S & L holding companies by states, the Connecticut Act conflicts with the Congressional decision to forgo regulation. Appellants cite Transcontinental Gas Pipe Line Corp. v. State Oil & Gas Board, --- U.S. ----, 106 S.Ct. 709, 88 L.Ed.2d 732 (1986), for this proposition.
 
 
 47
 We note, however, that in the circumstances of this case, Congress's silence as to whether states may regulate holding companies can just as easily be interpreted as implicit approval of state regulation. This interpretation seems a proper one to make given the fact that Congress indicated that it was aware at the time of the SLHCA's passage that states already regulated savings and loan holding companies and their subsidiaries. See 12 U.S.C. Sec. 1730a(b)(4) (1982) (concerning sharing of reports filed with, and examinations made by, state supervisory authorities).
 
 
 48
 Furthermore, the Transcontinental case is inapposite. In that case, the Supreme Court stated that " 'a federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left un regulated, and in that event would have as much preemptive force as a decision to regulate.' " Transcontinental, 106 S.Ct. at 717 (quoting Arkansas Electric Cooperative Corp. v. Arkansas Public Service Commission, 461 U.S. 375, 384, 103 S.Ct. 1905, 1912, 76 L.Ed.2d 1 (1983) (emphasis in original)). In that case, however, Congress had eliminated the Federal Energy Regulatory Commission's power to regulate particular aspects of the "first sale" of natural gas because it wanted the price and supply to be determined as much as possible by market forces. Id. at 716-17. By doing so, it impliedly preempted any state attempts to regulate the same aspects of the first sale of natural gas. Id. at 717. In our view, under the SLHCA, Congress's purpose in not restricting the activities of unitary holding companies was to ensure that the SLHCA did nothing to impair the marketability of S & L's rather than to ensure that S & L's remained marketable.
 
 
 49
 We therefore hold that the Supremacy Clause does not invalidate the challenged provisions of the Connecticut Act.
 
 
 50
 We have considered the appellants' other arguments and find them unpersuasive. The judgment of the district court is affirmed.
 
 
 
 [1]
 The Act states in pertinent part:
 Sec. 36-5a. Foreign corporations not to do business in this state. Excepted activities
 (a) Except as provided in sections 36-553 to 36-556, inclusive, no banking corporation which is organized under the laws of or has its principal office in any other state shall transact in this state the business authorized by its certificate of incorporation or by the laws of the state under which it was organized, unless empowered so to do by some general or special act of this state....
 (b) Except as provided in sections 36-553 to 36-556, inclusive, no banking corporation which is organized under the laws of or has its principal office in another state shall establish or maintain an office in this state for any purpose without the permission of the commissioner. Except as provided in section 36-553, no holding company, no subsidiary of a holding company and no subsidiary or affiliate of any banking corporation, shall establish or maintain an office in this state without the permission of the commissioner. The terms "holding company" and "subsidiary" shall have the meanings assigned to such terms in subsections (k) and (d) of section 36-419, respectively, except that for the purpose of this subsection and notwithstanding subsections (c) and (i) of section 36-419, the term "bank" as used in subsection (a) of section 36-419 shall mean any national bank, commercial bank, state bank and trust company, capital stock savings bank or industrial bank having its principal office in this or any other state and the term "association", as used in subsection (j) of section 36-419, shall mean any state-chartered or federally-chartered stock savings and loan association having its principal office in this or any other state. The commissioner may grant such permission if he determines that such office will not be used to enable such corporation, holding company or subsidiary or affiliate to engage in banking business in Connecticut. If, after a hearing conducted in accordance with chapter 54, the commissioner determines that an office for which permission has previously been granted is being used to enable the corporation, holding company or subsidiary or affiliate to engage in banking business in Connecticut, the commissioner shall suspend or revoke the permission previously granted. For the purpose of this subsection, the term "banking business" shall include, without limitation, receiving deposits, paying checks, lending money and any activity which is determined by the banking commissioner to be so closely related to banking as to be a proper incident thereto.
 (c) The provisions of subsection (b) of this section shall not apply to: (1) An office of a bank or association as defined in subsections (c) and (i) of section 36-419; (2) an office maintained for the purpose of managing or controlling such bank or association; (3) an office of a subsidiary of such bank or association or a mutual savings bank or mutual savings and loan association organized under the laws of or having its principal office located in this state, which subsidiary is limited to carrying on one or more of the functions which such bank or association or mutual savings bank or mutual savings and loan association organized under the laws of or having its principal office located in this state may carry on directly in the exercise of its express or implied powers; (4) an office of a holding company or subsidiary of a holding company or banking corporation which required and which had received all requisite state and federal authorization and was open for business prior to June 1, 1984, provided that such office may not engage in any activities other than those for which it had authorization and in which it was actually engaged on June 1, 1984; (5) an office of a mutual savings bank or mutual savings and loan association, whether or not a holding company, organized under the laws of or having its principal office located in this state; or (6) an office established pursuant to subsection (d) of this section.
 (d) Any holding company may establish, either directly or through any subsidiary of such holding company that is not a banking corporation, and any banking corporation that is not a subsidiary of a holding company may establish, through any of its subsidiaries that are not banking corporations, in addition to any offices maintained on June 8, 1983, not more than two offices in any calendar year for the purpose of engaging in banking business other than to provide deposit services and may maintain such offices in this state subject to the approval of the commissioner. For purposes of this subsection, "deposit services" shall include, without limitation, deposits, withdrawals, advances, payments and transfers of funds to or from a deposit account. Any applicant for permission to establish an office pursuant to this subsection shall pay to the commissioner a fee, in an amount fixed by the commissioner, to defray the costs of processing such applications. The number of offices which may be established in any calendar year pursuant to this subsection shall not be increased because of any failure to establish an office or offices in any prior year or years.
 Conn.Gen.Stat.Ann. Sec. 36-5a(a)-(d) (West Supp.1986).
 
 
 [2]
 This appeal involves only the enumerated banking functions. No ruling by the Commissioner as to other closely related activities has been made or challenged herein
 
 
 [3]
 The Act incorporates the definitions stated in Conn.Gen.Stat. Sec. 36-419. The term "Holding Company" is defined therein as meaning "a bank holding company or a savings and loan holding company." Conn.Gen.Stat.Ann. Sec. 36-419(k) (West Supp.1986). The term "bank holding company" is defined within the interstate banking provision and incorporated into the Act by reference to be coterminous with the meaning given the term within the federal Bank Holding Company Act, 12 U.S.C. Sec. 1841(a). The definition of S & L holding company is defined at Conn.Gen.Stat. Sec. 36-419(j)
 
 
 [4]
 Under Sec. 36-419(j) a S & L holding company means, inter alia,
 any company (1) which directly or indirectly owns, controls or holds with power to vote twenty-five percent or more of the voting shares of one or more [S & L companies] or of a company which is or becomes a savings and loan holding company....
 Conn.Gen.Stat.Ann. Sec. 36-419(j) (West Supp.1986). Clearly, Sears' ownership of AEI renders it an S & L holding company and, therefore, a holding company.
 
 
 [5]
 The sections extracted from the report by the appellants state:
 Upon the creation of our Commission, the issue with which the members struggled (and with which the Commission was charged under our Public Act) involved the advisability of a non-Connecticut banking organization being allowed to establish a banking operation in Connecticut or branching its own activities into Connecticut. As the members addressed the multi-faceted issues of interstate banking, we found ourselves, of necessity, having to review the effect and interplay of those Connecticut regulatory provisions governing intrastate banking organizations. The questions of mergers between commercial banks and thrift institutions, the EFT system, and the effect of the Home Office Protection laws bore so heavily on our analysis that they simply could not be ignored. Indeed, irrespective of the future direction of interstate banking, all seem to agree that there is a need for a review of Connecticut regulation so as to be sure that our own banks may be progressively more able to provide healthy competition within Connecticut as well as competition to the multi-national banking corporations.
 It also became very obvious to the Commission that the greatest amount of activity in the financial services industry came in recent years not from the banks, either foreign or domestic. It came through the emergence of far-flung networks of outlets that organizations such as Sears, Merrill Lynch, Shearson, American Express and many others created to compete on a local level with services which banks have traditionally provided. These institutions are free of Federal Reserve requirements, branching restrictions, many interest rate ceilings and bank holding company restrictions and are now effectively competing with the entire banking industry across the country. It did not take long for the Commission to conclude when analyzing the competitive impact of such institutions that the most unsophisticated consumer can quickly recognize that a money market fund yields a higher return than a bank account with a low interest rate ceiling while providing similar security. The average consumer is becoming increasingly aware. These non-banking institutions are able to use telephones, television and inordinately broad credit facilities to solicit and further develop their many businesses. Dramatically, the center of gravity of the financial services industry has shifted.
 Interstate banking cannot effectively be examined without analyzing its relationship and impact on intrastate banking. This necessitates a review of the entire system of intrastate banking laws and regulations and an assessment of the potential impact on Connecticut consumers of any changes in the intrastate and interstate regulations of the banking industry. It is equally apparent, that neither interstate banking nor intrastate banking may be addressed without a review and study of the non-depository institutions and the impact of their activities on traditional banking. Thus, the Commission applied for and received additional authority from the Connecticut General Assembly which allowed it to study and consider the three areas of concern: intrastate banking, interstate banking and the effect of multi-faceted non-deposit institutions on banking as a whole.
 ....
 Both at the national and state levels the philosophy underlying our structure of bank regulation has been to promote a pluralistic banking system--a system comprised of many units, rather than a highly concentrated system made up of a few large banks. The promotion of local ownership and control of banks has as one of its objectives the preservation of a close relationship between those in our communities who need credit and those who provide credit. To allow the control of credit that is essential for the health of our state economy to pass to hands that are not immediately responsive to the interests of Connecticut citizens and businesses would not, we believe, serve our state well. Similarly, to expose our smaller banks to the rigors of unlimited competition from large out-of-state banking organizations--particularly at a time when deregulation of banking products at the federal level is already putting strains on the resources of smaller banks--would not be wise.
 Report to the General Assembly of the State of Connecticut of the Findings and Recommendations of the Commission to Study Legislation to Limit the Conduct of Business in Connecticut by Subsidiaries of Bank Holding Companies and the Impact of Non-Depository Institutions on Traditional Banking Activities, 5-7, 10-11 (January 5, 1983).