NORTH CAROLINA ASSOCIATION OF ELECTRONIC TAX FILERS, INC., AND ROCKET REFUND, INC. v. WILLIAM T. GRAHAM, COMMISSIONER OF BANKS, NORTH CAROLINA BANKING COMMISSION

No. 228PA92

(Filed 7 May 1993)

1. Taxation § 28.4 (NCI3d) — Refund Anticipation Loan Act — no violation of Supremacy Clause

The Refund Anticipation Loan Act does not violate the Supremacy Clause of the U.S. Constitution since no intent to preempt state legislation on refund anticipation loans has been shown in federal statutes or in regulations of the Internal Revenue Service, and the Act does not interfere with the business operations of out-of-state national banks or with any federal regulatory authority over national banks. N.C.G.S. §§ 53-245 *et seq.*

**Am Jur 2d, Constitutional Law §§ 70 et seq.**

**State tax as inconsistent with federal law so as to violate supremacy clause (Art. VI, cl 2) of Federal Constitution— Supreme Court Cases. 93 L. Ed. 2d 1056.**

2. **Taxation § 28.4 (NCI3d)— Refund Anticipation Loan Act—no violation of Commerce Clause**

The Refund Anticipation Loan Act does not violate the Commerce Clause of the U.S. Constitution since the Act does not directly regulate interstate commerce and does not favor in-state economic interests over out-of-state interests; North Carolina has a legitimate interest in ensuring that this state's residents are fully informed as to (1) the difference between a refund anticipation loan and simple electronic filing of refunds and (2) the potentially high cost of a refund anticipation loan; and the burden on interstate commerce is minimal and does not exceed the local benefits.

**Am Jur 2d, Commerce §§ 1 et seq.**

On discretionary review pursuant to N.C.G.S. § 7A-31 prior to a determination by the Court of Appeals of summary judgment for defendant entered by Stephens, J., at the 12 February 1992 Civil Session of Superior Court, Wake County. Heard in the Supreme Court 13 January 1993.

*Kennedy, Kennedy, Kennedy & Kennedy, by Harvey L. Kennedy and Harold L. Kennedy, III, for plaintiff-appellants.*

*Michael F. Easley, Attorney General, by Philip A. Lehman, Assistant Attorney General; and L. McNeil Chestnut and Mercedes Oglukian for defendant-appellee.*

*North Carolina Legal Services Resource Center, Inc., by Gregory C. Malhoit, and North State Legal Services, Inc., by Carlene McNulty, for North Carolina Clients Council, amicus curiae.*

PARKER, Justice.

Plaintiffs filed this action for a declaratory judgment asserting that the Refund Anticipation Loan Act, N.C.G.S. §§ 53-245 to 53-254 (effective Oct. 1, 1990), violates both the Supremacy Clause and the Commerce Clause of the United States Constitution and asking

## N.C. ASSN. OF ELECTRONIC TAX FILERS v. GRAHAM

[333 N.C. 555 (1993)]

that the Act be declared unconstitutional on its face and in its application to refund anticipation loans made by out-of-state national banks. Plaintiffs moved for summary judgment; the trial court denied plaintiffs' motion and entered summary judgment in favor of defendant. The court concluded (i) there are no genuine issues of material fact and (ii) the Refund Anticipation Loan Act violates neither the Supremacy Clause nor the Commerce Clause of the United States Constitution. On 16 July 1992 this Court granted plaintiffs' petition for discretionary review. Before this Court plaintiffs again contend the Act violates the Supremacy Clause and the Commerce Clause. We disagree and affirm summary judgment for defendant.

Plaintiffs are North Carolina corporations, each with its principal place of business in Southern Pines, North Carolina. Plaintiff Association is composed of North Carolina businesses participating in the Internal Revenue Service Electronic Filing Program for Form 1040, which permits taxpayers to file income tax returns electronically. Plaintiff Rocket Refund is a member of the Association. Members of plaintiff Association also accept and facilitate refund anticipation loan ("RAL") applications utilizing the loan services of out-of-state national banks. To determine the validity of plaintiffs' arguments that the Refund Anticipation Loan Act violates the Supremacy and Commerce Clauses of the United States Constitution, we need at the outset to examine pertinent revenue procedures and the provisions of the Act itself.

To be accepted into the Electronic Filing Program for Form 1040, an applicant must complete an application, undergo testing of its transmitting capability, pass a suitability check, receive a letter of acceptance and obtain a filing or transmitter identification number. Rev. Proc. 91-69, 1991-2 C.B. 893, 894 (effective Jan. 1, 1992); *see also* Rev. Proc. 90-62, 1990-2 C.B. 659, 660 (effective Jan. 1, 1991). Once accepted, a participant becomes an electronic filer and is categorized as an electronic return originator, a software developer, a transmitter, or some combination thereof. Rev. Proc. 91-69, 1991-2 C.B. at 894. Revenue procedures inform electronic filers "of their obligations to the Internal Revenue Service, taxpayers, and other participants." *Id.* at 893. Responsibilities of electronic filers include ensuring that complete returns are accurately and efficiently filed and complying with all publications and notices of the Electronic Filing Systems Office. *Id.* at 895. If an electronic filer charges a fee for transmission of a tax return, the fee may

not be based on a percentage of the refund amount. *Id.* Penalties are provided for disclosure or use of tax return information. *Id.* at 896. In addition, electronic filers who also meet the definition of income tax preparers may be subjected to preparer penalties. *Id.* The Internal Revenue Service ("the Service") monitors electronic filers for conformity with revenue procedures; this monitoring includes checking on (i) timely receipt and legibility of forms and (ii) quality of transmission, including rejections, errors and other defects. *Id.* at 899. The Service also monitors complaints about filers. The Service may issue a warning letter describing specific corrective action for deviations from Revenue Procedure 91-69 or may immediately suspend a filer from the program. *Id.*

According to Section 9 of Revenue Procedure 91-69, "Direct Deposit of Refunds," a taxpayer expecting to receive a refund may file a return electronically and elect to have the refund deposited directly into a bank account. *Id.* at 897; *see also* Rev. Proc. 90-62, 1990-2 C.B. at 662. Section 10 of Revenue Procedure 91-69 recognizes that often taxpayers borrow against expected refunds:

> .01 A Refund Anticipation Loan (RAL) is money borrowed by a taxpayer that is based on a taxpayer's anticipated income tax refund. The Service has no involvement in RALs. This is a contract between the taxpayer and the lender. An acknowledgement from the Service that a taxpayer's return is accepted for processing is not a guarantee to either the taxpayer or a lender that the taxpayer will receive a refund or what the amount of any refund might be.

Rev. Proc. 91-69, 1991-2 C.B. at 897. By contrast, the predecessor procedure, Revenue Procedure 90-62, provided simply, "The Service has no involvement in RALs. This is a contract between the taxpayer and the financial institution." Rev. Proc. 90-62, 1990-2 C.B. at 663. Section 10 of Revenue Procedure 91-69 also provides as follows:

> .02 Any entity that is involved in the Electronic Filing Program, including a financial institution that accepts direct deposits of income tax refunds, has an obligation to every taxpayer who applies for an RAL to ensure that the taxpayer understands that an RAL is in fact a loan, and not a substitute for or a quicker way of receiving an income tax refund. Consequently, if a direct deposit is not made as originally anticipated

by the taxpayer, the taxpayer may be liable for additional interest or fees.

Rev. Proc. 91-69, 1991-2 C.B. at 898. Other language in Section 10 regulating electronic filers facilitating RALs includes (i) a provision requiring written consent of the taxpayer before the filer may disclose tax information to a lender and (ii) a prohibition against guaranteeing the amount of the refund or the date it will be issued. *Id.* at 898.

The Refund Anticipation Loan Act defines an RAL as "[a] loan that the creditor arranges to be repaid directly from the proceeds of the debtor's income tax refund." N.C.G.S. § 53-246(8) (Supp. 1992). Creditors are those who make RALs, *id.* § 53-246(4); and facilitators are those who process, receive, or accept for delivery an application for an RAL or a check in payment of RAL proceeds or otherwise facilitate the making of RALs, *id.* § 53-246(6). RAL fees are "charges, fees, or other considerations charged or imposed by" creditors or facilitators. *Id.* § 53-246(9). RAL fees are distinct from charges for nonloan services such as preparation or electronic filing of returns. *Id.*

The Act requires persons handling RAL applications to register with the North Carolina Commissioner of Banks. *Id.* § 53-247(a). Banks, savings associations or credit unions doing business under North Carolina or United States law are specifically exempted. *Id.* § 53-247(c). Failure to register constitutes a misdemeanor punishable by imprisonment of up to sixty days, a fine of up to $2,000, or both. *Id.* § 53-247(b). Registration procedures include submitting an application and fee of $250.00 for each office wherein RALs will be facilitated. *Id.* § 53-248(a). In addition the Commissioner must find "that the responsibility and general fitness of the applicant are such as to command the confidence of the community and to warrant belief that the business of facilitating [RALs] will be operated" in accord with the Act. *Id.* If not renewed, registration expires on 31 December following the date issued; and the renewal fee is $100.00. *Id.* § 53-248(b).

Registrants are subject to additional regulation, in that they must file fee schedules, *id.* § 53-249(a); post them prominently, *id.* § 53-249(c); and make full disclosure to debtors, *id.* § 53-249(d). More specifically, registrants must disclose

[e]xamples of the annual percentage rates, as defined by the Truth In Lending Act, 15 U.S.C. § 1607 and 12 C.F.R. Section 226.22, for refund anticipation loans of five hundred dollars ($500.00), seven hundred fifty dollars ($750.00), one thousand dollars ($1,000), one thousand five hundred dollars ($1,500), two thousand dollars ($2,000), and three thousand dollars ($3,000). Regardless of disclosures of the annual percentage rate required by the Truth In Lending Act, if the debtor is required to establish or maintain a deposit account with the creditor for receipt of the debtor's tax refund to offset the amount owed on the loan, the maturity of the loan for the purpose of determining the annual percentage rate disclosure under this section shall be assumed to be the estimated date when the tax refund will be deposited in the debtor's account.

*Id.* § 53-249(d)(6).

In addition, acts specifically prohibited include (i) misrepresentation of a material factor or condition of an RAL; (ii) failing to arrange for an RAL promptly upon application; (iii) engaging in fraud; (iv) facilitating an RAL for which the fee is different from that posted or filed with the Commissioner or has been determined to be unconscionable; (v) demanding part of the loan proceeds for check cashing, credit insurance, or other goods or services unrelated to preparing and filing returns or facilitating RALs; and (vi) arranging for a secured interest in property other than the debtor's refund proceeds. *Id.* § 53-250. Upon finding that any conduct of a registrant may be in violation of the Act or that a registrant has engaged in an unfair or deceptive act or practice, the Commissioner must give notice and an opportunity for the registrant to be heard. *Id.* § 53-251. Upon finding conduct to be in violation of the Act, the Commissioner shall issue a cease and desist order. *Id.* Appeals may be taken to the North Carolina Court of Appeals. *Id.* § 53-252. If a registrant fails to appeal and continues to engage in prohibited conduct cited in a cease and desist order, there is a mandatory $1,000 penalty for each such act. *Id.* § 53-251(a). Registration may be revoked for a course of conduct in violation of the Act or continually engaging in conduct cited in a cease and desist order. *Id.* § 53-251(b). Civil penalties include (i) for failure to deliver proceeds of an RAL within forty-eight hours of the time promised, refund of the RAL fee and (ii) for engaging in prohibited acts, treble RAL fees (or other unauthorized charges) plus a reasonable attorney's fee. *Id.* § 53-251(c).

[1] Plaintiffs' first contention is that the Refund Anticipation Loan Act violates the Supremacy Clause. We disagree.

As stated by the United States Supreme Court, under the Supremacy Clause

> the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land." US Const, Art VI, cl 2. In determining whether Congress has invoked this pre-emption power, we give primary emphasis to the ascertainment of congressional intent. This may be manifested in several ways. Chief among the indications of an intent to pre-empt is where Congress has legislated so comprehensively that it has left no room for supplementary state legislation. Pre-emption may also be found where state legislation would impede the purposes and objectives of Congress. In undertaking this analysis, however, we must be mindful of the principle that "federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons — either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained."

*R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 140, 93 L. Ed. 2d 449, 461-62 (1986) (citations omitted); *see also Cipollone v. Liggett Group, Inc.*, --- U.S. ---, ---, 120 L. Ed. 2d 407, 420 (1992) (reiterating that intent to preempt may be explicitly stated in statute and finding explicit statements in Federal Cigarette Labeling and Advertising Act of 1965 and Public Health Cigarette Smoking Act of 1969).

In *Reynolds Tobacco*, the issue was whether Congress had exercised its power under the Supremacy Clause to preempt state ad valorem taxation of imported goods stored in customs-bonded warehouses and destined for domestic markets. The federal statute at issue was 19 U.S.C. § 1556, and in deciding the preemption question in favor of the state, the Court said:

> Nor is there any suggestion that [ad valorem] taxation here would conflict with the central purpose behind the customs-bonded warehouses: to ensure that federal customs duties are collected. Not only is the present statutory and regulatory framework sufficient to permit customs officials to monitor

the entrance and removal of goods [and] to guarantee collection of federal revenue, but Reynolds does not explain how . . . imposition of the North Carolina tax will prevent customs officials from receiving the duties. And the present statutes and regulations that guide this monitoring . . . are not so comprehensive as to leave no room for North Carolina's assessment of ad valorem taxes. Although the regulations are not themselves controlling on the pre-emption issue, where, as in this case, Congress has entrusted an agency with the task of promulgating regulations to carry out the purposes of a statute [19 USCS § 1556], as part of the pre-emption analysis we must consider whether the regulations evidence a desire to occupy a field completely. Pre-emption should not be inferred, however, simply because the agency's regulations are comprehensive. In this case, the current regulations, while detailed, appear to contemplate some concurrent state regulation and, arguably, even state taxation.

*Id.* at 148-49, 93 L. Ed. 2d at 467 (citations omitted). The Court held that North Carolina could, consistent with the Supremacy Clause, impose a nondiscriminatory ad valorem property tax on imported goods stored in a customs-bonded warehouse and destined for domestic manufacture and sale. *Id.* at 152, 93 L. Ed. 2d at 469.

Following *Reynolds Tobacco*, we begin with the principle that federal regulation is not deemed preemptive in the absence of persuasive reasons. We turn first to plaintiffs' argument that Congress has legislated so comprehensively that it has left no room for supplementary state legislation on RALs. The only federal taxation statute cited by plaintiffs provides as follows:

**Regulations requiring returns on magnetic media, etc.**

**(1) In general**

The Secretary shall prescribe regulations providing standards for determining which returns must be filed on magnetic media or in other machine-readable form. The Secretary may not require returns of any tax imposed by subtitle A on individuals, estates, and trusts to be other than on paper forms supplied by the Secretary.

**(2) Requirements of regulations**

In prescribing regulations under paragraph (1), the Secretary —

(A) shall not require any person to file returns on magnetic media unless such person is required to file at least 250 returns during the calendar year, and

(B) shall take into account (among other relevant factors) the ability of the taxpayer to comply at reasonable cost with the requirements of such regulations.

26 U.S.C. § 6011(e) (Supp. II 1990). By its plain language this statute pertains only to electronic filing. One regulation cited by plaintiffs provides as follows:

**Composite return in lieu of specified form.**

The Commissioner may authorize the use, at the option of a person required to make a return, of a composite return in lieu of any form specified in this part for use by such a person, subject to such conditions, limitations, and special rules governing the preparation, execution, filing, and correction thereof as the Commissioner may deem appropriate. Such composite return shall consist of a form prescribed by the Commissioner and an attachment or attachments of magnetic tape or other approved media. Notwithstanding any provisions in this part to the contrary, a single form and attachment may comprise the returns of more than one such person. To the extent that the use of a composite return has been authorized by the Commissioner, references in this part to a specific form for use by such a person shall be deemed to refer also to a composite return under this section.

26 C.F.R. § 1.6012-5 (1992). By its plain language this regulation pertains to composite returns. Another regulation cited by plaintiffs, 26 C.F.R. § 301.7701-15(c) (1992), mentions neither electronic filing nor RALs.

The only authority cited by plaintiffs that specifically mentions RALs is Revenue Procedure 90-62, which as noted and discussed above has been superseded by Revenue Procedure 91-69. Defendant argues that revenue procedures, being informal Service publications, are without legal effect in Supremacy Clause challenges. *Caterpillar Tractor Co. v. United States*, 589 F.2d 1040, 1043 (Ct. Cl. 1978) (stating, "[I]nformal publications all the way up to revenue rulings are simply guides to taxpayers."); *see also* 26 C.F.R. § 601.601(d)(2)(i)(b) (1992) (defining "Revenue Procedure" as a state-

ment that affects rights or duties of taxpayers under the Code and related statutes); Michael D. Rose and John C. Chommie, *Federal Income Taxation* 9-10 (3d ed. 1988) (stating that less important Service interpretations include revenue rulings; other interpretations include revenue procedures).

Even if revenue procedures had the force and effect of a federal statute or regulation, however, we are unable to conclude that either Revenue Procedure 90-62 or its successor, Revenue Procedure 91-69, shows an intent to preempt by comprehensively legislating RALs. The detailed procedures govern electronic filing of tax returns, not RALs. In fact, both revenue procedures specifically disclaim such intention, stating, "The service has no involvement in RALS." Rev. Proc. 91-69, 1991-2 C.B. at 897; Rev. Proc. 90-62, 1990-2 C.B. at 663. The additional language in Revenue Procedure 91-69 requiring filers to ensure that taxpayers understand RALs are loans and not a substitute for or a quicker way of receiving income tax refunds is not, in our view, indicative of preemptive intent. The Service itself did not consider the 1991 additions to Revenue Procedure 90-62 to be significant changes. Rev. Proc. 91-69, 1991-2 C.B. at 894. Comparing the two revenue procedures with the comprehensive legislative schemes at issue in *Reynolds Tobacco* and *Cipollone*, we conclude plaintiffs have failed to show preemptive intent in federal statutes or in regulations or publications of the Service.

Plaintiffs also contend the Refund Anticipation Loan Act violates the Supremacy Clause because it infringes upon and interferes with business operations of out-of-state banks. Again we disagree.

Banks are specifically exempted from the operation of the Act. N.C.G.S. § 53-247(c). The requirements of the Act are applicable only to in-state, nonbank facilitators of RALs. Even if banks were not exempt, however, plaintiffs have cited neither a specific provision of the National Banking Act nor any interpretive regulation indicative of preemptive intent with respect to RALs, and our research discloses none. Moreover, the record discloses no evidence that any business activities of any national banks are impeded by the Act or that the Act interferes with any federal regulatory authority over national banks.

"[I]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any

party is entitled to a judgment as a matter of law," summary judgment "shall be rendered forthwith." N.C.G.S. § 1A-1, Rule 56 (1990); *Collingwood v. G.E. Real Estate Equities*, 324 N.C. 63, 66, 376 S.E.2d 425, 427 (1989). Plaintiffs having failed to show any comprehensive legislative scheme indicative of Congress' intent to preempt state legislation on RALs, we conclude the Refund Anticipation Loan Act does not violate the Supremacy Clause; therefore, we hold the trial court did not err in granting summary judgment for defendants on this issue.

[2] Plaintiffs' second and final contention is that the Act violates the Commerce Clause. Again we disagree.

"Although the commerce clause conferred on the national government power to regulate commerce . . . in the absence of conflicting legislation by Congress, there is a residuum of power in the state[s] to make laws governing matters of local concern which nevertheless . . . affect interstate commerce or even . . . regulate it." *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 766-67, 89 L. Ed. 1915, 1923 (1945); *see also Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662, 669-70, 67 L. Ed. 2d 580, 586 (1981) (reaffirming same principle). "Not every exercise of state power with some impact on interstate commerce is invalid." *Edgar v. MITE Corp.*, 457 U.S. 624, 640, 73 L. Ed. 2d 269, 282 (1982). A two-tiered approach to analyzing state economic regulation under the Commerce Clause has been adopted by the United States Supreme Court:

> When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits. We have also recognized that there is no clear line separating the category of state regulation that is virtually per se invalid under the Commerce Clause and the category subject to the . . . balancing approach. In either situation the critical consideration is the overall effect of the statute on both local and interstate activity.

*Brown-Forman Distillers v. N.Y. Liquor Auth.,* 476 U.S. 573, 578-79, 90 L. Ed. 2d 552, 559-60 (1986) (citations omitted). In *Brown-Forman Distillers,* appellant contended that a state statute directly regulated interstate commerce because it effectively regulated the price at which liquor was sold in other states and disadvantaged consumers in other states. *Id.* at 579-80, 90 L. Ed. 2d at 560. Defendant argues, and we agree, that the Refund Anticipation Loan Act does not directly regulate interstate commerce and that it does not favor in-state economic interests over out-of-state interests. In this respect we find plaintiffs' case to be distinguishable from *Brown-Forman.*

Turning, then, to the second tier of the *Brown-Forman* analysis, we note first that since all RAL facilitators are required to register, the Act regulates evenhandedly. In addition, the legitimacy of the Act's purpose is unassailable. The Act's primary purpose is consumer protection: It ensures disclosure of two kinds of information important to potential debtors. First, facilitators must disclose that RAL transactions are not the same as tax refunds or the electronic filing of tax returns. In addition the actual cost of an RAL must be disclosed.

The actual cost of an RAL, expressed as an annual percentage rate, may be quite high. The affidavit of W. Reitzel Deaton, Consumer Finance Administrator for the North Carolina Banking Commission, states that the typical transaction includes three separate fees, all deducted from the debtor's loan proceeds: (i) a preparation fee (if the registrant is also the preparer); (ii) a fee for electronic filing; and (iii) a fee charged by the creditor who makes the loan. The Commissioner's authority as to fees is limited to determining if loan fees are unconscionable. N.C.G.S. § 53-249(b). The average loan fee charged in 1991 was $33.00. The Commissioner has determined that a loan fee of $60.00 would be unconscionable. The effective annual percentage rate for a $500.00 RAL with a $60.00 loan fee would be 243.33%, based on an 18-day period for repayment by refund, the period used by the largest RAL facilitator in North Carolina. According to defendant, the effective annual percentage rate for a $500.00 RAL with a $30.00 loan fee would be over 100% for the same 18-day period. We agree with defendant that North Carolina has an interest in ensuring that this state's residents are fully informed as to (i) the difference between an RAL and simple electronic filing of refunds and (ii) the potentially high cost of an RAL.

The United States Supreme Court has recognized that state statutes enacted for a legitimate local purpose may still violate the Commerce Clause if they further the purpose only marginally or place an undue burden on interstate commerce. *Kassel v. Consolidated Freightways Corp.*, 450 U.S. at 670, 67 L. Ed. 2d at 587. The burden imposed on interstate commerce by the Refund Anticipation Loan Act, however, is minimal. We also note that other courts have protected state registration statutes from challenges based on the Commerce Clause. *Sears, Roebuck and Co. v. Brown*, 806 F.2d 399 (2d Cir. 1986) (applying balancing test and holding banking statute, which regulated manner and extent to which bank or savings and loan holding companies could establish offices in state, did not violate Commerce Clause); *Oil Resources v. State of Fla., Dept. of Banking*, 583 F. Supp. 1027 (S.D. Fla.) (applying balancing test and holding statute, which required securities dealers to register with state banking department, did not violate Commerce Clause), *aff'd*, 746 F.2d 814 (11th Cir. 1984).

Furthermore, the Act is not different in scope from other North Carolina statutes which require registration or licensing of businesses for consumer protection purposes. These include statutes governing finance companies, N.C.G.S. §§ 53-165 to 53-191 (1990 and Supp. 1992); collection agencies, N.C.G.S. §§ 58-70-1 to 58-70-125 (1991); loan brokers, N.C.G.S. §§ 66-106 to 66-112 (1991); business opportunity sellers, N.C.G.S. §§ 66-94 to 66-100 (1992); mortgage brokers, N.C.G.S. §§ 53-233 to 53-244 (1990 and Supp. 1992); and automobile dealers and manufacturers, N.C.G.S. §§ 20-285 to 20-308.2 (1989 and Supp. 1992). All these businesses may be engaged in interstate commerce. Nevertheless, the constitutionality of such state regulatory statutes is accepted because they serve the legitimate purpose of consumer protection and impose only a minimal burden on interstate commerce.

Having determined that the Act's burden on interstate commerce is only incidental; that the burden does not exceed the local benefits; and that no pervasive federal regulatory scheme exists for RALs, we conclude the Refund Anticipation Loan Act does not place an undue burden on interstate commerce. Accordingly, we hold that under *Collingwood*, the trial court did not err in granting summary judgment for defendant on this issue.

AFFIRMED.