Abrons Family Practice & Urgent Care v. N.C. Dep't Health & Human Servs., 2015 NCBC 60.

STATE OF NORTH CAROLINA          IN THE GENERAL COURT OF JUSTICE
                                         SUPERIOR COURT DIVISION
COUNTY OF WAKE                              14 CVS 635

| | |
|---|---|
| ABRONS FAMILY PRACTICE AND URGENT CARE, PA; NASH OB-GYN ASSOCIATES, PA; HIGHLAND OBSTETRICAL-GYNECOLOGICAL CLINIC, PA; CHILDREN'S HEALTH OF CAROLINA, PA; CAPITAL NEPHROLOGY ASSOCIATES, PA; HICKORY ALLERGY & ASTHMA CLINIC, PA; HALIFAX MEDICAL SPECIALISTS, PA and WESTSIDE OB-GYN CENTER, PA, Individually and on Behalf of All Others Similarly Situated, <br>            Plaintiffs <br><br>        v. <br><br> NORTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES, and COMPUTER SCIENCES CORPORATION, <br>            Defendants | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) **AMENDED OPINION AND ORDER ON MOTIONS TO DISMISS** |

THIS CAUSE, designated a mandatory complex business case by Order of the Chief Justice of the North Carolina Supreme Court, pursuant to N.C. Gen. Stat. § 7A-45.4(b) (hereinafter, references to the North Carolina General Statutes will be to "G.S."), and assigned to the undersigned Special Superior Court Judge for Complex Business Cases, comes before the Court upon Defendant North Carolina Department of Health and Human Services' ("Department" or "DHHS") Motion to Dismiss ("DHHS' Motion to Dismiss"), and Defendant Computer Science Corporation's ("CSC") Motion to Dismiss ("CSC's Motion to Dismiss," together with DHHS' Motion to Dismiss, "Motions to Dismiss"). On April 15, 2015, the Court held a hearing on the Motions to Dismiss.

THE COURT, after reviewing the motions, briefs in support of and in opposition to the motions, the record evidence filed by the parties, the arguments of counsel, and other appropriate matters of record, FINDS and CONCLUDES as stated herein.

*Williams Mullen by Camden R. Webb, Esq. and Elizabeth C. Stone, Esq., for Plaintiffs.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, LLP by Jennifer K. Van Zant, Esq., Charles F. Marshall III, Esq., and Bryan Starrett, Esq., and Baker Botts LLP by Bryant C. Boren, Jr., Esq., Van H. Beckwith, Esq., and Ryan Bangert, Esq., for Defendant Computer Sciences Corporation.*

*North Carolina Department of Justice by Olga E. Vysotskaya de Brito, Esq., Amar Majmundar, Esq., and Iain Stauffer, Esq., for Defendant North Carolina Department of Health and Human Services.*

McGuire, Judge.

## PROCEDURAL HISTORY

1.     Plaintiffs Abrons Family Practice and Urgent Care, PA; Nash OB-GYN Associates, PA; Highland Obstetrical-Gynecological Clinic, PA; Children's Health of Carolina, PA; Capital Nephrology Associates, PA; Hickory Allergy & Asthma Clinic, PA; Halifax Medical Specialists, PA; and Westside OB-GYN Center, PA (collectively, "Plaintiffs"), initiated this action on January 16, 2014, on behalf of themselves and all others similarly situated. On January 21, 2014, Plaintiffs filed their First Amended Class Action Complaint ("Amended Complaint"), asserting the following causes of action: Claim One (Negligence against CSC); Claim Two (Unfair and Deceptive Trade Practices against CSC); Claim Three (Breach of Contract against Department); Claim Four (Declaratory Judgment); and Claim Five (Violation of North Carolina Constitution, Art. I, § 19).[1]

2.     On April 4, 2014, CSC filed its Motion to Dismiss pursuant to Rule 12 of the North Carolina Rules of Civil Procedure ("Rule(s)"). On the same date, the Department filed its Motion to Dismiss pursuant to Rule 12.  Plaintiffs and Defendants also filed numerous affidavits in support of their respective positions regarding the exhaustion of administrative remedies and this Court's subject matter jurisdiction over the claims in this action.

---

[1] Plaintiffs initially asserted Claims One and Two against CSC and Defendant SLI Global Solutions, Inc. ("SLI"). On December 1, 2014, Plaintiffs voluntarily dismissed all claims asserted against SLI with prejudice.

3.     The Motions to Dismiss have been fully briefed and argued, and are ripe for determination.

## FACTUAL BACKGROUND

Among other things, the Amended Complaint alleges that:

4.     Plaintiffs are medical practices across the State of North Carolina, all of which provide care to Medicaid-eligible patients and all of which have Medicaid contracts with the State of North Carolina. Additionally, Plaintiffs were all "of the category of persons known to Defendants prior to July 1, 2013[,] to be an intended end user of NCTracks."[2]

5.     DHHS is an administrative agency of the State of North Carolina and is the sole state agency designated in this State to "administer or to supervise the administration of the North Carolina state Medicaid plan."[3]

6.     CSC is a Nevada corporation with its principal office in Falls Church, Virginia. CSC was responsible for the design and development of NCTracks, and currently operates that system.[4]

7.     The North Carolina Medicaid system serves approximately 1.5 million low-income or disabled North Carolinians. Through this system, DHHS, or its vendors, contractors, or agents, processes approximately 88 million Medicaid claims annually.[5] To process this volume of claims, DHHS and providers rely on an electronic payment system to reimburse care providers who treat Medicaid-eligible patients.[6]

8.     In 2003, the federal Centers for Medicare and Medicaid Services ("CMS") required the State of North Carolina to replace its antiquated Medicaid Management

---

[2] Am. Compl. ¶¶ 5-12.
[3] *Id.* ¶ 13.
[4] *Id.* ¶ 14.
[5] *Id.* ¶¶ 16-17.
[6] *Id.* ¶ 20.

Information System ("MMIS"). That year, the State of North Carolina issued a Request for Proposal ("RFP") for a new MMIS. After the initial MMIS replacement project failed, the State issued another RFP in 2007. This RFP "contemplated that the State would purchase a single, comprehensive computer system that would handle all Medicaid provider enrollments and claims processing."[7] In December 2008, the State awarded the MMIS contract to CSC, under which CSC would design and develop, and ultimately operate, the new system, NCTracks. Part of CSC's obligation to operate the NCTracks system included the establishment and operation of a call center to answer questions from Medicaid providers about NCTracks and Medicaid reimbursement procedures under this system.[8]

9. In performing its contract to develop NCTracks, Plaintiffs allege that CSC made a number of critical errors in the design and development of that system that "doomed the success of NCTracks."[9] Plaintiffs allege that CSC, as developer of NCTracks, owed Plaintiffs, intended users of NCTracks, a duty "to exercise reasonable care in the design, development, and implementation of the system."[10] Plaintiffs allege that this duty is separate and apart from any contractual duty or requirement under its contract to develop NCTracks.[11] Plaintiffs allege that CSC has taken a number of actions that have breached this duty of reasonable care and have caused damage to Plaintiffs.

10. Plaintiffs allege that CSC based NCTracks on an outdated computer programming language called Common Business-Oriented Language ("COBOL"). This programming language, Plaintiffs allege, was a factor in the failure of a New York MMIS system designed and implemented by CSC in the early 2000s. Despite knowledge of the failed

---

[7] *Id.* ¶ 25.
[8] *Id.* ¶ 33.
[9] *Id.* ¶ 40.
[10] *Id.* ¶ 52.
[11] *Id.* ¶ 65.

New York MMIS and COBOL, CSC elected to base NCTracks on the New York MMIS system "for its own financial benefit."[12]

11. Moreover, Plaintiffs allege that CSC made a number of miscalculations regarding the amount of code from the New York MMIS system that could be used in NCTracks. The result of these miscalculations was that CSC was required to "develop significantly more code from scratch than it had initially represented," causing delays in the implementation of NCTracks.[13]

12. Additionally, prior to the NCTracks system "going live," CSC was responsible for setting "acceptance criteria," by which the operational readiness of the system would be measured. Plaintiffs allege that CSC set these criteria based on "its own desire to complete the project, regardless of the quality of the software," instead of basing acceptance criteria on the needs of the end users.[14] Based on the acceptance criteria set by CSC, the State terminated its contract for the legacy MMIS system, thereby eliminating any possible back-up system should NCTracks fail upon going live.

13. Plaintiffs also allege that CSC failed to adequately test NCTracks, particularly as to the volume of Medicaid providers that would use the system at any given time.[15] Additionally, due to CSC's setting of its own acceptance criteria, Plaintiffs allege that the testing process, to be performed by SLI Global Solutions, INC. ("SLI"), was inherently flawed.[16] SLI, in turn, also failed to properly test NCTracks, including a failure to conduct approximately 285 of 834 "critical" test cases.[17]

---

[12] *Id.* ¶ 46.
[13] *Id.* ¶ 46.
[14] *Id.* ¶ 62.
[15] *Id.* ¶ 55.
[16] *Id.* ¶ 70.
[17] *Id.* ¶¶ 67-68.

14.     In May of 2013, the Office of the State Auditor released a report documenting "serious problems with the NCTracks project and warn[ing] against implementation" of the software on the scheduled go-live date, July 1, 2013, unless the problems were resolved. The report indicated that NCTracks "had not been properly tested, the testing process was highly flawed, no defined test plan or testing acceptance criteria had been established, CSC was allowed to set its own testing criteria, and no formal criteria to determine if NCTracks was ready for go-live had been established."[18]

15.     Despite this warning, on July 1, 2013, and after CSC misrepresented the status of the system, NCTracks became operational. Plaintiffs allege that, almost immediately, "they experienced, and continue to experience, catastrophic software errors and design problems with NCTracks."[19] Plaintiffs contend that they experienced a number of technical issues, including system inaccessibility due to high demand,[20] the inability of the system to process certain claims,[21] and the failure of a number of NCTracks features.[22] As a result, Plaintiffs have suffered financial harm in the form of improperly denied claims, reimbursements that were paid at a lower rate than that required, and damages to the Plaintiffs' businesses, including time and expenses associated with addressing the issues with NCTracks.

16.     In addition, Plaintiffs allege that CSC has failed to exercise reasonable care in operating NCTracks and in failing to correct the defects in the system. Namely, Plaintiffs allege that CSC has failed to train its call center employees, in many cases has failed to provide anything more than temporary software fixes, and has failed to pay reimbursements

---

[18] *Id.* ¶¶ 73-74.
[19] *Id.* ¶ 77.
[20] *Id.* ¶ 54.
[21] *Id.* ¶ 58.
[22] *See id.* ¶ 77.

for improper payments once a software error has been resolved.[23] These actions have continued to cause harm to Plaintiffs following the implementation of NCTracks.

17.    The aforementioned actions, Plaintiffs allege, constitute negligence and violations of G.S. § 75-1.1 on the part of CSC. Additionally, the ultimate failure to pay reimbursements for Medicaid-eligible services provided by Plaintiffs constitutes a breach of contract between Plaintiffs and DHHS and also constitutes a taking of Plaintiffs' property, their Medicaid reimbursements, by the State without compensation in violation of Article 1, Section 19 of the North Carolina Constitution.

18.    In addition to the technical failures surrounding the development and operation of NCTracks, Plaintiffs allege that DHHS, as of July 1, 2013, changed the payment methodology regarding how providers are paid for so-called Medicare Crossover claims. These claims involve patients who are eligible for Medicare and Medicaid. Before July 1, 2013, a claim would be submitted to Medicare for payment and the remainder would be paid, at least in part, by Medicaid. Plaintiffs allege that this procedure was improperly altered and that "the newly-imposed payment methodology is invalid," although Plaintiffs do not specifically allege how the procedure was amended or why the current procedure is invalid.[24] Based on these facts, Plaintiffs seek a declaratory judgment that the payment methodology imposed by DHHS is "not in accordance with Medicaid reimbursement rules established by statute and regulation."[25]

19.    Plaintiffs' Amended Complaint additionally contains Class Action allegations and, particularly important at this stage, allegations that Plaintiffs lacked any adequate administrative remedy to pursue these claims before filing suit. Plaintiffs allege that the

---

[23] *Id.* ¶¶ 80-87.
[24] *See id.* ¶¶ 98-103.
[25] *Id.* ¶ 165.

administrative procedures are inadequate and futile because certain damages, including business damages, sought here are not available in those proceedings, that the amount per claim at issue makes those remedies "entirely impractical," and that DHHS and CSC have made those procedures, in practice, very difficult to follow. As to the last justification, Plaintiffs allege that the same software defects and operational negligence on the part of Defendants outlined above have resulted in "a complete breakdown of reimbursement procedures throughout North Carolina's Medicaid system" such that "providers have no redress in DHHS" and, therefore, no administrative remedies are available to Plaintiffs.[26]

## DISCUSSION

20. The Motions to Dismiss seek dismissal of Plaintiffs' Claims pursuant to Rules 12(b)(1), 12(b)(2), and 12(b)(6).

21. Rule 12(b)(1) allows a party to move to dismiss an action at any stage for lack of subject matter jurisdiction. "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Rule 12(h)(3). When a plaintiff fails to exhaust administrative remedies, "the court lacks subject matter jurisdiction and the action must be dismissed." *Justice for Animals, Inc. v. Robeson Cnty.*, 164 N.C. App. 366, 369 (2004).

22. If a court lacks personal jurisdiction over a defendant, dismissal pursuant to a motion under Rule 12(b)(2) is proper. Although some courts have held that sovereign immunity presents a question of personal jurisdiction, the North Carolina Court of Appeals has noted that whether the doctrine of sovereign immunity presents a question of subject matter jurisdiction or personal jurisdiction "is an unsettled area of the law in North Carolina." *Zimmer v. N. Carolina Dep't of Transp.*, 87 N.C. App. 132, 133 (1987).

---

[26] *Id.* ¶¶ 133-38.

23.     Under Rule 12(b)(6), dismissal is appropriate if a plaintiff's complaint fails to state a claim for which relief may be granted. The Court, in deciding a Rule 12(b)(6) motion, treats the well-pleaded allegations of the complaint as true and admitted. *Sutton v. Duke*, 277 N.C. 94, 98 (1970). However, conclusions of law or unwarranted deductions of fact are not deemed admitted. *Id*. The facts and permissible inferences set forth in the complaint are to be treated in a light most favorable to the nonmoving party. *Ford v. Peaches Entm't Corp.*, 83 N.C. App. 155, 156 (1986). As our Court of Appeals has noted, the "essential question" raised by a Rule 12(b)(6) motion is "whether the complaint, when liberally construed, states a claim upon which relief can be granted on any theory." *Barnaby v. Boardman*, 70 N.C. App. 299, 302 (1984) (citations omitted). A motion to dismiss should be granted only if "it appears certain that [the plaintiff] can prove no set of facts which would entitle [it] to relief under some legal theory." *Fussell v. N.C. Farm Bureau Mut. Ins. Co.*, 364 N.C. 222, 225 (2010).

*24.*     While the Court is limited in its review of a motion pursuant to Rule 12(b)(6) to the factual allegations contained in the Amended Complaint, no such limitation exists as to Rules 12(b)(1) or 12(b)(2), and the Court may consider matters outside of the Amended Complaint. *See Harris v. Matthews*, 361 N.C. 265, 271 (2007) (regarding Rule 12(b)(1)); *Data Gen. Corp. v. Cnty. Durham*, 143 N.C. App. 97, 102 (2001) (regarding Rule 12(b)(2)).

### Federal Preemption

25.     As a preliminary matter, DHHS contends that "Plaintiffs' State [law] claims for relief based on the alleged inefficiencies of NCTracks are preempted by federal laws that dictate MMIS requirements."[27] DHHS argues that because federal law dictates the requirements for state MMIS systems, and CMS reviews and certifies the state MMIS

---

[27] DHHS Br. Supp. Mot. Dismiss 20-22. DHHS, however, limits its preemption argument to "Plaintiffs' contractual, declaratory and constitutional claims" made only against DHHS.

systems, any state law claims related to North Carolina's NCTracks system must be preempted by federal law.

26.     In determining whether Congress has exercised its power to preempt state law, "the critical question . . . is always whether Congress intended that federal regulation supersede state law." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368-69 (1986).  The North Carolina Supreme Court has summarized the necessary analysis as follows:

> In determining whether Congress has invoked this pre-emption power, we give primary emphasis to the ascertainment of congressional intent. This may be manifested in several ways. Chief among the indications of an intent to pre-empt is where Congress has legislated so comprehensively that it has left no room for supplementary state legislation. [Preemption] may also be found where state legislation would impede the purposes and objectives of Congress. In undertaking this analysis, however, we must be mindful of the principle that "federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons -- either that the nature of the regulated subject matter permits no other conclusion, or that Congress has unmistakably so ordained."

*N.C. Ass'n of Elec. Tax Filers v. Graham*, 333 N.C. 555, 561, (1993) (quoting *R.J. Reynolds Tobacco Co. v. Durham Cnty.*, 479 U.S. 130, 140 (1986)).

27.     DHHS has not shown that Congress has "unmistakably" expressed its intent to preempt state law with regard to matters relating to Medicaid by pointing to any specific statute, rule, regulation, legislative history, congressional testimony, or rulemaking commentary. Nor has DHHS provided any persuasive authority suggesting that "Congress has legislated so comprehensively [in the area of Medicaid] that it has left no room for supplementary state legislation." To the contrary, as it relates to the administration of the Medicaid program, federal law and regulations require the *states* to establish rates of reimbursement and to promptly pay providers in accordance with those rates.  42 CFR §§ 447.1, 447.45, 447.201, 447.203, 447.205.

28.    Ultimately, the Court concludes that DHHS has failed to establish that federal law preempts Plaintiffs' State law claims. Accordingly, DHHS' Motion to Dismiss based on federal preemption should be DENIED.

### Failure to Exhaust Administrative Remedies

29.    Defendants seek dismissal of all of Plaintiffs' claims pursuant to Rule 12(b)(1) on the grounds that this Court lacks subject matter jurisdiction over those claims because Plaintiffs did not exhaust their administrative remedies prior to filing this action. Where a plaintiff fails to exhaust available administrative remedies, the court lacks subject matter jurisdiction. *Vass v. Bd. Trs. Teachers' & State Emps.' Comprehensive Major Med. Plan*, 324 N.C. 402, 408-09 (1989).

30.    Regarding exhaustion of administrative remedies, our Supreme Court has recognized that

> "[a]s a general rule, where the legislature has provided by statute an effective administrative remedy, that remedy is exclusive and its relief must be exhausted before recourse may be had to the courts." *Presnell v. Pell*, 298 N.C. 715, 721 (1979). "An action is properly dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction where the plaintiff has failed to exhaust administrative remedies." *Shell Island Homeowners Ass'n v. Tomlinson*, 134 N.C. App. 217, 220 (1999).

*Craig v. Faulkner*, 151 N.C. App. 581, 583 (2002). However, where the administrative remedy is inadequate, a plaintiff is not required to exhaust that remedy before turning to the courts. *Shell Island*, 134 N.C. App. at 222. The burden of establishing the inadequacy of an administrative remedy is on the party asserting inadequacy. *Huang v. N.C. State Univ.*, 107 N.C. App. 110, 115 (1992).

31.    North Carolina courts have consistently held that where the General Assembly has provided a review process wherein a matter is first addressed by "commissions or agencies particularly qualified for the purpose,. . . after the appropriate agency has developed

its own record and factual background upon which its decision must rest should the courts be available to review the sufficiency of its process." *Presnell*, 298 N.C. at 721-22.

32. Defendants contend that all of Plaintiffs' claims in this action could have been addressed and remedied through the relevant administrative procedures. These procedures provide, first, for "reconsideration review" within DHHS, followed by a contested case hearing before an administrative law judge at the Office of Administrative Hearings. 10A NCAC 22J.0102–.0104; G.S. § 150B-23. Defendants argue that these procedures are highlighted and further explained in the NCMMIS Provider Claims and Billing Assistance Guide ("Billing Guide") available to all Medicaid-eligible care providers.[28] Since Plaintiffs did not exhaust these administrative procedures, Defendants contend that their claims in this action must be dismissed.

33. The applicable regulations state that a "provider may request a reconsideration review within 30 calendar days from receipt of final notification of payment, payment denial, disallowances, payment adjustment, notice of program reimbursement. . . ." 10A NCAC 22J.0102. That section further states that "final notification . . . means that all administrative actions necessary to have a claim paid correctly have been taken by the provider and [the NC Division of Medicaid Assistance ("DMA"), a division of DHHS] or the fiscal agent has issued a final adjudication." *Id.* This process provides an opportunity for reconsideration review of any payment decision and states that "[i]f a provider disagrees with the reconsideration review decision he may request a contested case hearing." 10A NCAC 22J.0104.

34. The Billing Guide, in turn, provides as follows:

> The purpose of the regulations contained in 10A NCAC 22J.0101-.0105 is to specify the rights of providers to appeal reimbursement rates, payment denials, disallowances, payment adjustments and cost settlement

---

[28] First Landman Aff., Ex. J., § 12.2.

disallowances and adjustments. The process to appeal a claims denial is summarized below. Please note that provider appeals for actions taken by program integrity and appeals about reimbursement rates, disallowances, payment adjustments and cost settlement disallowances and adjustments are excluded from the process below. These actions should be appealed to the DHHS Hearing Office and the DMA Finance Management Section.[29]

35. The Billing Guide then summarizes, and in some cases recites verbatim, the regulations contained in 10A NCAC 22J.0102 - .0105. The Billing Guide states that appeals should be directed to the DMA Appeals Unit, Clinical Policy and Programs, and provides a mailing address in Raleigh.

36. Here, Plaintiffs admit that they did not exhaust the administrative remedies available under the DHHS regulations. Significantly, none of the Plaintiffs even attempted to use the administrative procedures to address the failure to pay claims and other issues they allegedly encountered in attempting to use NCTracks. Instead, Plaintiffs allege that the administrative process *would have been* futile and inadequate to provide the relief they seek.

37. Plaintiffs' argument that the administrative remedies available to them would have been inadequate is somewhat unique. Plaintiffs contend that DHHS, through its fiscal agent CSC, does not issue "final adjudications" or "final notices" that would trigger the reconsideration review and contested case processes and, consequently, Plaintiffs would be unable to obtain a "final agency decision" from which they might seek judicial review.[30] Plaintiffs argue, and have presented affidavit evidence which suggests, that the Remittance Statements and Billing Guide are so confusing and contradictory that Medicaid providers

---

[29] *Id.*
[30] Pl.'s Mem. Opp. CSC's Mot. Dismiss, 2-10.

cannot even determine how to initiate the claims review process, and, accordingly, none of the Plaintiffs have done so.[31]

38.      Once Medicaid reimbursement claims have been submitted, providers receive Remittance Statements that notify them of Medicaid claims that have been paid and those that have been denied, and the amount for which the provider is being reimbursed for the claims submitted.[32] These Remittance Statements can range from several pages to over 1000 pages.[33]  The Remittance Statements provide codes explaining the reasons for each claim denial, and some denied claims show multiple reason codes for the denial.  The Remittance Statements do not contain any language indicating that they are "final notices" or "final adjudications" of the claims. The statements themselves do not reference an appeal procedure. Instead, the Remittance Statements offer providers the opportunity to correct certain identification numbers used in the claims by mail, but otherwise provide as follows:

> FOR BILLING QUESTIONS/INQUIRIES PLEASE LOGON TO NCTRACKPROVIDER PORTAL OR CALL AUTOMATED VOICE RESPONSE (AVR) SYSTEM 1-800-723-4337 OR CALL CSC PROVIDER SERVICES 1-100-688-6696.

39.      Despite the direction to logon on to NCTracks for questions, the NCTracks website "has no function that allows providers to submit requests for reconsideration review" or any other appeal process.[34]  Plaintiffs' affidavits from the providers who attempted to pursue their claims thorough the AVR or CSC Provider Services System were all consistent. All of those providers claim that the telephone representatives with whom they spoke were unable to give them any significant assistance, and in many cases lacked a fundamental understanding of the Medicaid reimbursement process. Telephone representatives

---

[31] *See generally* Blum Aff.; Cook Aff; Elmore Aff; Burgess Aff.; Luca Aff.; Blair Aff.; Curlee Aff.; Leonard Aff.
[32] Blum Aff. Ex. A.
[33] Cook Aff. ¶ 8.
[34] *Id.* ¶ 11.

sometimes suggested that providers resubmit claims in an attempt to obtain a different payment result, but resubmission of claims did not result in payments of claims.

40.     Defendants attempt to counter Plaintiffs' evidence with statistics showing that NCTracks processed and paid a large number of claims during its first year of operation, and that the AVR and CSC Provider Services call centers have operated relatively efficiently in answering telephone calls.[35] Defendants also attempt to explain that the more likely reason for the high incidence of claims denials and changes in payment results experienced by some of the affiants is the increased scrutiny of Medicaid claims mandated by the federal government.[36] Defendants admit, however, that they are aware of only a very limited number of provider appeals that have made it to the contested case stage with OAH during the almost two years since NCTracks went live.  This strongly suggests that the appeal procedure is difficult to understand and implement, and, at a minimum, cumbersome to use.

41.     The Court has reviewed the Remittance Statements, regulations, and Billing Guide and concludes that they create a very confusing and difficult process for providers to determine why claims have been denied and how to appeal denials.  The Remittance Statements are difficult to decipher.  They do not contain any language indicating that the claims decisions contained in the statements are "final" adjudications or qualify as "final notifications," within the regulatory language set forth above. That regulatory language does not specify what actions are included in the phrase "all administrative actions," leaving at least some question as to whether telephone calls to the AVR and CSC Provider Services to seek assistance are "administrative actions" required before a claims decision becomes a

---

[35] Second Landman Aff. ¶¶ 9, 17.
[36] *See id.* ¶ 21.

"final adjudication." Similarly, the provision in the Billing Guide regarding certain types of appeals being excluded from the reconsideration review process is also confusing.[37]

42.     Nevertheless, at this stage Plaintiffs have only speculated that the process would be futile.  Again, none of the Plaintiffs or the affiants appear to have attempted to initiate an appeal.  While the regulations and Billing Guide are confusing, the regulations expressly explain an appeal process that can be initiated by making "a request for reconsideration review" within 30 days to DMA at the division's address. Even if the Remittance Statements do not clearly state that they are a "final adjudications" of the claims, at some point common sense would suggest that a provider would at least attempt to follow the appeal procedure provided for in the regulations and the Billing Guide, even if simply to get a determination as to whether the Remittance Statements constituted a final adjudication.

43.     Significantly, the process for seeking review of Medicaid claims decisions did not change with the implementation of NCTracks, but, rather, has apparently been in place for some time.  None of the affidavits from providers submitted by Plaintiffs state that any of the providers had ever initiated a claims review prior to the implementation of NCTracks. The inference from the facts in evidence is that the new, heightened scrutiny of Medicaid claims that led to the implementation of NCTracks also led to a much higher percentage of claims being denied, and caused these providers to attempt for the first time to use the appeals process.

44.     Ultimately, because no Plaintiff has actually availed itself of the administrative review procedure, the Court is unpersuaded by Plaintiffs' speculative argument that DHHS did not sufficiently provide finality or effective review and appeal

---

[37] *See* Pls.' Mem. Opp. CSC's Mot. Dismiss 7-8.

procedures. Speculation that the administrative review process would have been futile is not sufficient to justify bypassing the exhaustion requirements. *Affordable Care, Inc. v. American Dental Partners, Inc.*, 153 N.C. App. 527, 534 (2002) ("[F]utility cannot be established by plaintiffs' prediction or anticipation that the Commission would rule adversely to plaintiffs' interests.").

45.  Plaintiffs also contend that, even if DHHS "provided finality and effective review and appeal procedures," Plaintiffs should not be required to exhaust administrative remedies in this case because some of the remedies they seek cannot be obtained from DHHS. In particular, Plaintiffs argue that they are seeking damages for (a) "the processing and payment of legitimate, undisputed reimbursement claims" caused by Defendants' "implementation of defective software," (b)  damages that were caused by the negligent design, construction, and implementation of the software, such as interruption to the Plaintiffs' businesses and damages caused by late payment of claims" and (c) for relief "because DHHS has changed reimbursement rules without following required procedures, has failed to apply mandatory reimbursement rules, and is otherwise out of compliance with applicable reimbursement rules."[38]

46.  As noted above, where "the remedy established by the APA is inadequate, exhaustion is not required. The remedy is considered inadequate unless it is 'calculated to give relief more or less commensurate with the claim.' The plaintiffs have the burden of showing, by allegations in the complaint, that the particular remedy is inadequate." *Shell Island*, 134 N.C. App. at 222-223 (internal citations omitted). The Court of Appeals has recognized that, particularly where a plaintiff alleges that administrative remedies are inadequate, the court's duty is to "focus on the allegations of [the] complaint" to determine

---

[38] Pls.' Memo. Opp. CSC's Mot. Dismiss 11.

the nature of the plaintiff's primary claim and consider whether the administrative remedies could adequately provide relief for that claim. *Jackson v. N. Carolina Dep't Human Resources*, 131 N.C. App. 179, 188-89 (1998). A plaintiff "should not be permitted to bypass administrative procedures by merely pleading a request" for ancillary relief. *Id*. at 187. Accordingly, the Court now turns to Plaintiffs' claims for relief to determine whether each could adequately be addressed through the relevant administrative procedures.

*Claims for Unpaid Medicaid Reimbursements*

47. The crux of Plaintiffs' Amended Complaint is that Defendants failed to properly pay Medicaid reimbursement claims.[39] The Amended Complaint is replete with allegations that Plaintiffs' Medicaid claims have been improperly denied, delayed, or otherwise mishandled.[40] In short, the Court concludes that Plaintiffs' "primary claims" in this action are for unpaid Medicaid reimbursements and the Court's focus should be on whether the administrative remedies could adequately provide relief for those claims. *Jackson*, 131 N.C. App. at 188-89.

48. These claims, brought for the failure to pay legitimate, undisputed reimbursement claims, fall squarely within the type of claims that should be resolved through the DHHS administrative procedures. To recover on these claims, Plaintiffs will have to show that the claims at issue were improperly denied. The determination of whether claims were properly paid or denied is precisely the determination that should be made, in the first instance, by the agency charged with administering the State Medicaid program. *See id*.; G.S. § 108C-12 (requiring that any appeal from an adverse determination, defined as a decision to "deny, terminate, suspend, reduce, or recoup a Medicaid payment," be pursued through the contested case procedure provided by the Administrative Procedure Act).

---

[39] *See* Am. Compl. ¶¶ 92-130.
[40] *See id*.

49.     As to these claims, the Court concludes that Plaintiffs were required to first exhaust the available administrative remedies before seeking redress in this Court. Specifically, the Court concludes that Plaintiffs' claims for breach of contract (Claim Three) and violation of the North Carolina Constitution (Claim Five) seek damages for the payment of improperly or incorrectly denied Medicaid reimbursement claims that could potentially have been adequately remedied through DHHS' administrative review and appeal process. Since Plaintiffs have not alleged that they pursued the administrative processes, they have failed to allege facts establishing that this Court has jurisdiction over those claims. Accordingly, Defendants' motions to dismiss those claims should be GRANTED, and Plaintiffs claims for breach of contract and for violation of the North Carolina Constitution should be DISMISSED.

*Claim for Declaratory Judgment*

50.     As to Plaintiff's claim based on DHHS' allegedly improper change to mandatory reimbursement rules and failure to follow Medicaid reimbursement rules, this claim implicates two potential remedies: reimbursement of incorrectly denied claims, and the declaratory relief sought in Plaintiffs' Claim Four.[41] As discussed above, with regard to improperly denied claims, the administrative process could provide the remedy sought by Plaintiffs, and Plaintiffs were required to attempt to exhaust the administrative process.

51.     Similarly, as to the declaratory relief sought in Claim Four, Plaintiffs were required to first seek a declaratory ruling from DHHS regarding the reimbursement rules under the Administrative Procedure Act before bringing a claim in this Court. G.S. § 150B-4(a); *see Chatmon v. N.C. HHS*, 175 N.C. App. 85, 88-89 (2005) (holding that, since the plaintiff did not seek a declaratory ruling from DHHS, she could not seek that ruling directly

---

[41] *Id.* ¶¶ 163-166.

from the Superior Court); *Woodlief v. Johnson*, 75 N.C. App. 49, 56 (1985) (finding absence of subject matter jurisdiction over declaratory judgment action because the plaintiff failed to first seek a declaratory ruling from the North Carolina Department of Natural Resources under the APA). Accordingly, the Court concludes that Plaintiffs have failed to exhaust their administrative remedies regarding DHHS' alleged changes to the reimbursement rules, and Defendants' motions to dismiss those claims should be GRANTED, and Plaintiffs claims for declaratory judgment should be DISMISSED.

*Claims for Damages to Plaintiffs' Businesses*

52.     Plaintiffs contend that they should not be required to exhaust administrative remedies on their claims for negligence and unfair and deceptive trade practices because those claims seek damages that cannot be provided by the administrative process. Plaintiffs argue that the tort-type damages for business interruptions and lost business opportunities caused by CSC's negligent design and implementation of NCTracks cannot be remedied by relief available through the administrative process. Accordingly, Plaintiffs contend they should not be required to exhaust their administrative remedies as a prerequisite for filing this lawsuit. [42]

53.     As noted above, in determining the adequacy of administrative remedies, the Court's duty is to identify the nature of Plaintiffs' "primary claim." *Jackson*, 131 N.C. App. at 188-89. Once the Court has determined the primary claim raised by the Complaint, it must determine whether the administrative remedy provides relief "more or less commensurate" with the claim. If the administrative relief is adequate to remedy the primary claim, then the plaintiff must have exhausted the administrative process before filing a suit in court.

---

[42] Pls.' Br. Opp. CSC's Mot. Dismiss 11-14.

54. Our appellate courts have not provided definitive guidance for identifying a complaint's primary claim, but the Court of Appeals' decision in *Jackson* is instructive. In *Jackson*, the plaintiff's son, Randy, was a Medicaid-eligible child enrolled a State administered mental health treatment program. 131 N.C. App. at 181. The State agency administering the mental health program refused the plaintiff's doctor-recommended request to admit her son to a mental health hospital. *Id.* The plaintiff alleged that, despite her requests, the State agency never provided her with information about her right to appeal the denial, and delayed providing a written notice of the denial. The plaintiff claimed her son suffered compensatory damages as a result of not being admitted to the hospital. *Id.* at 181-82. The plaintiff filed suit in Superior Court seeking monetary damages, and injunctive and declaratory relief. The defendant moved to dismiss because the plaintiff had not exhausted the applicable administrative process, and the trial court granted the motion to dismiss. *Id.* at 184. On appeal, the plaintiff argued, *inter alia*, that the trial court erred in dismissing her complaint because the administrative forum could not provide the compensatory monetary damages she sought based the denial of medical care and violation of her son's constitutional rights. *Id.* at 186. The Court of Appeals affirmed the dismissal of the plaintiffs' claim for monetary damages, holding:

> Notwithstanding the relief for which plaintiff prays in this case, we must focus on the allegations of her complaint; *plaintiff's primary claim is for the provision of mental health care to which she asserts Randy is entitled under Federal and State Medicaid programs.* That is an issue which should properly be determined in the first instance by the agencies statutorily charged with administering the public system for the delivery of such care, through administrative procedures and without premature intervention by the courts. The procedures available through the NCAPA are calculated to require, if plaintiff is correct, the provision of such care and, thus, "to give relief more or less commensurate" with her claim. We do not believe plaintiff's insertion of a prayer for monetary damages in this case renders administrative relief inadequate so as to relieve her from the requirement that she exhaust available administrative remedies before resorting to the courts.

> *Id.* at 188-89 (emphasis added).

55.     A review of the extensive allegations in the Amended Complaint in this case leaves no doubt as to Plaintiffs' primary claim or as to the primary relief Plaintiffs' seek. Plaintiffs seek reimbursement for Medicaid claims that were improperly denied because of CSC's negligent design, implementation, and administration of the NCTracks system.[43] In fact, of the eight categories of damages enumerated in the Amended Complaint, seven of those categories begin with the statement "[r]eimbursements were not paid."[44] Four of those seven categories expressly make references to problems with the NCTracks system.[45] The eighth category of damages sought by Plaintiffs are the tort-type damages, including: "salaried employee time diverted to addressing the problems imposed by NCTracks; hiring of additional employees; additional wages and overtime paid for employees to contend with NCTracks; interest on loans taken to cover cash flow shortages due to non-payment of reimbursements; lost clinical time; lost profits for services they have been unable to perform; and similar harm to Plaintiffs' businesses."[46] (hereinafter these damages are collectively referred to as "business damages").  These damages were caused primarily, if not exclusively, by the improper failure to pay Medicaid claims.

56.     The Plaintiffs' arguments in their Memorandum confirm that Plaintiffs' primary claim negligence damages arise from the failure to properly reimburse Medicaid claims.  Plaintiffs argue that "CSC's wrongdoing led to the implementation of defective software that has prevented the processing and payment of legitimate, undisputed reimbursement claims" and that Plaintiffs seek "damages that were caused by implementation of the software, such as interruption to the Plaintiffs' businesses and

---

[43] Am. Compl. ¶ 92 (a)-(h).
[44] *See id.*
[45] *Id.* ¶ 92(b), (c), (f), and (g).
[46] *Id.* ¶ 92(h).

damages caused by late payment of claims" and "damages, including the nonpayment of properly submitted claims, the lost time value of money, and other damages, which were caused by defects in NCTracks itself."[47]

57.     In addition, the evidence contained in the affidavits filed by Plaintiffs relates to the time and effort spent by Medicaid providers in attempting to get reimbursement denials reviewed. Tellingly, with regard to Plaintiffs' claim for alleged damages for the "hiring of additional employees," the affidavit of Rebecca Burgess, an insurance/billing representative for Plaintiff Nash Ob/Gyn Associates, P.A., for example, states that she "was contracted by [the provider] for the specific *task of addressing unpaid Medicaid reimbursement claims* that had been pending since NCTracks went live."[48] As such, the Court is not persuaded by Plaintiffs' contention that their claims for business damages are entirely separate from their claims for unpaid Medicaid reimbursements.

58.     Accordingly, the Court concludes that Plaintiffs' primary claim in this case is for reimbursement for Medicaid claims that they allege were improperly not paid because of flaws in the design, implementation, and administration of the NCTracks system, and for related business damages resulting from the non-payments. The administrative remedies available are "calculated to give relief more or less commensurate with [this] claim." The determination of whether these claims were improperly paid or denied should be made, in the first instance, by the agency charged with administering the State's Medicaid program. Indeed, without evidence that any Plaintiff attempted to pursue these administrative remedies, the Court concludes that it is simply premature to determine that the claim for additional business damages renders those remedies inadequate. Accordingly, as in *Jackson*, that Plaintiffs have pleaded an ancillary claim for monetary damages does not render the

---

[47] Pls.' Mem. Opp. CSC's Mot. Dismiss 11, 12-13.
[48] Burgess Aff. ¶3 (emphasis added).

available administrative process inadequate so as to relieve Plaintiffs from the requirement that they first exhaust their administrative remedies before seeking redress in this Court.[49] Because Plaintiffs have failed to exhausts these administrative remedies, Defendants' Motions to Dismiss should be GRANTED, and Claims One and Two should be DISMISSED.

CONCLUSION

59.     Ultimately, the burden of proving that administrative remedies are inadequate in this action rests on Plaintiffs. *Jackson*, 131 N.C. App. at 186. Although sympathetic to the apparently difficult administrative process, the Court concludes that, particularly in light of the fact that not a single Plaintiff has attempted to use the available administrative procedures to resolve their Medicaid reimbursement claims, Plaintiffs have simply failed to satisfy this burden. Accordingly, Defendants' Motions to Dismiss pursuant to Rule 12(b)(1) should be GRANTED. Because the Court concludes that it lacks subject matter jurisdiction over Plaintiffs' claims, it need not address the arguments raised by Defendants under Rules 12(b)(2) or 12(b)(6).

THEREFORE, IT IS ORDERED that:

60.     Defendants' Motions to Dismiss pursuant to Rule 12(b)(1) are GRANTED.

61.     Defendants' Motions to Dismiss pursuant to Rules 12(b)(2) and 12(b)(6) are DENIED, as moot.

62.     This Amended Opinion and Order shall supersede the Opinion and Order on Motions to Dismiss entered on June 11, 2015, in all respects. The June 11 Opinion and Order is WITHDRAWN.

---

[49] The Court notes that Plaintiffs did not cite to any authority to support their assertion that the business damages they seek could not be sought through the administrative process, and the Court is unable to find any specific statute, regulation, or case law expressly stating that tort-type damages are unavailable as a remedy at the administrative level in this context.

This the 12th day of June, 2015.

 /s/ Gregory P. McGuire

Gregory P. McGuire
Special Superior Court Judge
  for Complex Business Cases